In the United States District Court For The District Of Nevada



Keith Raymond Streater |

*Plaintiff*, (Pro Se) |

|

v. |

City of Henderson, Et Al |

*Defendant* |

|

**FILED** ___ **RECEIVED**
**ENTERED** ___ **SERVED ON**
COUNSEL/PARTIES OF RECORD

JUL 2 0 2015

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

**2:15-cv-01384-APG-GWF**

**Plaintiff's Memorandum Of Points And Authorities In Support Of Its Motion For Claims Brought Against Defendants.**

Keith Raymond Streater (pro se)

43 West Pacific Blvd, Henderson Nevada 89015

Namor90304@yahoo.com

### Jurisdiction

Jurisdiction is proper in that plaintiff is alleging multiple violations of federal criminal and civil statutes. Plaintiff is also alleging multiple violations of rights guaranteed by the United States Constitution raising federal questions. Plaintiff also alleges a nationwide conspiracy involving all city and state governments which is a case or controversy involving more than one state which in turn presents original jurisdiction to the federal court.

### Venue

Venue is proper in that all or a substantial part of the acts and omissions forming the basis of these claims occurred arose in the District of Nevada.

### Statement of Facts

While plaintiff lived in the state of New Jersey, before relocating to Nevada, plaintiff had an accident and was taken to the Cooper Hospital Emergency Room in Camden New Jersey. Plaintiff received a few stiches and was released from the hospital. Around a week later plaintiff received a bill from Cooper Hospital for thousands of dollars for surgery he never received.

In April, of 2012 plaintiff drove from New Jersey to Nevada. On May 1, 2012 plaintiff arrived in the city of Las Vegas Nevada. Soon after plaintiff began to rent an apartment in the area of the Stratosphere Casino. A few weeks later plaintiff returned home to discover that someone had been in his apartment and had flooded it. Near the end of July 2012 plaintiff was stopped and searched by the Las Vegas Police Department while walking down the street near the Stratosphere Casino. After the officer questioned plaintiff about his nonexistent street name and gang affiliations the officer told plaintiff that the plaintiff was being stopped and searched because he was walking in the street and not on the sidewalk. On August 15, 2012 unable to find gainful employment, plaintiff left his apartment and became homeless.

While at Mccarran Airport plaintiff was walking from the car port to the bus stop when out of nowhere three unmarked vehicles surrounded the plaintiff flashing red and blue police lights. They searched the plaintiff's person and then asked plaintiff for his identification and made the plaintiff stand in front of a police vehicle with his hands placed upon the front hood while they ran plaintiff's identification and outstanding warrants. They told the plaintiff that earlier, someone who fit the description of the plaintiff had been inside the terminal trying to steal luggage. After they discovered that the plaintiff had no priors or outstanding warrants the police released the plaintiff.

In September, of 2012 plaintiff entered a park to sit and rest for a moment. Plaintiff rested his head upon a table and no more than five minutes later a Marshal approached him and told plaintiff to turn around to be handcuffed because he was going to prison for being in a park reserved for children. After placing plaintiff in the back of the police car in handcuffs they ran plaintiff's identification for priors and outstanding warrants. After discovering that plaintiff didn't have any priors or outstanding warrants the officers asked plaintiff if he would like a ticket instead of going to jail. Plaintiff opted for the ticket and was released and told to appear in court on the scheduled date. Plaintiff later appeared in court on the scheduled date but was then informed that the appearance had been rescheduled for the next month. Plaintiff then walked from Las Vegas to the city of Henderson Nevada with the intent of catching a bus back to Las Vegas to appear for the rescheduled hearing.

The day of plaintiff's arrival into Henderson Plaintiff entered into an agreement with the owner of an unoccupied complex in Calico Ridge. The owner requested that Plaintiff occupy the roped off and isolated property and to secure his possessions upon the property and plaintiff agreed. A few days later while plaintiff was walking through the residential area of Calico Ridge plaintiff was stopped and searched and made to sit upon the curb while the Henderson Police checked plaintiff for priors and outstanding warrants. After discovering that plaintiff didn't have any priors or outstanding warrants plaintiff was informed that he was not allowed to walk in that neighborhood and if he was seen there again he would be arrested and taken to prison.

A few days later plaintiff was on the property getting a few things organized in a small corner of the property. A resident saw the plaintiff from her back yard and asked the plaintiff what he was doing on the property. Plaintiff told the resident that he was the new security for the property. The resident told the plaintiff that she didn't believe him and that she had the owner's phone number and was going to call him to tell him about the plaintiff. Approximately two hours later the owner showed up on the property. The owner told the plaintiff that a resident had called him about the plaintiff and that he assured her that plaintiff was the new security for the property and that plaintiff could be on the property at any time.

1

Approximately a week later while plaintiff was returning from Lake Las Vegas a Henderson Police officer entered the property and told plaintiff to leave the property or go to jail. Plaintiff tried to explain that he had been given authority from the owner of the property to be on the property for the purpose of securing the property. The officer refused to listen to anything the plaintiff had to say and again threatened the plaintiff with arrest. Plaintiff then gathered his belongings and left the property and walked back to Las Vegas. After a few days plaintiff walked back to Henderson and contacted a representative of the owner who told plaintiff that there was a mix up with the police and that the police where then aware of plaintiff's authority to be on the property which was given to him by the owner. Plaintiff then resumed his security duties

The second week of September 2013 while plaintiff was walking on the sidewalk away from the property near the ice cream plant, plaintiff noticed a Henderson police vehicle heading towards the property. The vehicle stopped at the roped off entrance to the property for a moment then began to speed toward the plaintiff. The officer stopped, questioned and searched plaintiff then made plaintiff sit on the curb with his hands behind his back while the officer ran his Identification for priors and outstanding warrants.

The officer told plaintiff that he had received a call about someone trying to brake in and steal copper from the unoccupied buildings. The Henderson officer waited until another officer arrived before he informed plaintiff that he had an outstanding warrant in the city of Las Vegas and that plaintiff was going to the Las Vegas City Jail. Plaintiff was transported to the city limit and transferred to the Las Vegas Police then Plaintiff spent two weeks in the Las Vegas City Jail. 90% of plaintiff's fellow inmates where of black or Latino heritage.

While plaintiff was incarcerated within the Las Vegas City Jail plaintiff received three meals per day. While plaintiff was incarcerated plaintiff was informed that he had extremely high blood pressure and was given blood pressure medication.

After plaintiff was released from jail plaintiff returned to Henderson and resumed his security duties upon the property at Calico Ridge. Plaintiff was approached by the Henderson police upon the property on different occasions. They always informed plaintiff that they were either on the property because they received a report that someone was trying to break in and steal copper from the buildings or that they had received a report about a suspicious looking character walking around the property. On every occasion plaintiff explained to the police that he had authority from the owner to secure the premises. The police told plaintiff that they would check his story out and if he was lying to them they would come back and take him to jail. Plaintiff never heard from any of them again.

Plaintiff has also been approached by civilians walking onto the property. Some with nefarious intent. Each time plaintiff informed the civilians that they were on private property and needed to leave before plaintiff called the owner who would then call the police. Every time they left and never returned.

Approximately a year and a half ago the owner arrived on the property in the morning. The owner asked plaintiff to help him move some merchandise into the buildings. Plaintiff agreed and received monetary compensation for his labor.

One weekend plaintiff was headed to a local casino to watch the NFL playoffs. Plaintiff was walking from Target across an empty lot and in front of the Library. Plaintiff turned left onto the walkway pass

2

the side of the library. Plaintiff then spotted a Henderson police car hidden in the back of the library. The policeman told plaintiff to stand in front of the police vehicle and to empty out his pockets upon the hood. He told the plaintiff that the department had received reports about people trying to break into the library to steal copper when it was closed. The officer then told plaintiff that plaintiff had walked too close to the library when it was closed. The officer then ran plaintiff's identification for priors and outstanding warrants while plaintiff stood in front of the police vehicle with his hands upon the hood. After the officer discovered that plaintiff had no priors or outstanding warrants the officer warned plaintiff not to walk close to the library when it was closed then he released the plaintiff.

Approximately four months ago Plaintiff was approached on the property by an officer Scoble of the Henderson Police Department. Officer Scoble informed plaintiff that he was there because someone called in a report about somebody trying to break in and steal copper from the buildings and that plaintiff was not allowed to be on the property. Plaintiff tried to explain the security agreement he had reached with the owner but officer Scoble didn't believe the plaintiff and told him if his story didn't check out that he would be back for the plaintiff.

On Easter Sunday 2015, during Passover plaintiff was at Lake Las Vegas reading his Bible in a shaded corner. The maintenance manager approached plaintiff and asked him what he was doing. Plaintiff told him that he was reading the Bible. The manager told plaintiff that "he couldn't do that sort of thing there and that it would be appreciated if plaintiff exited the premises." Plaintiff left the premises. Plaintiff then began to spend part of the mornings at the property in order to get his readings done and out of the way for the day.

Around a week later Officer Scoble returned at 3:30 am this time with Officer Anderson. Officer Scoble told plaintiff that he was unable to confirm plaintiff's claims. Officer Scoble then told plaintiff that although he was unable to confirm plaintiff's claim and that he and the plaintiff both knew that the plaintiff was lying he didn't mind plaintiff being on the property. The officer also told plaintiff that he was stationed out of the way and pretty much hidden from sight, quiet and not bothering anybody and even though plaintiff didn't belong on the property plaintiff's presence on the property was a deterrent to criminals coming on to the property to steal and helped out the department. The only thing was that the plaintiff had to be off of the property in the mornings. Plaintiff quickly agreed to the officer's request and the officers left the premises.

On April 5, 2015 the owner called the police to the property because he had received an alarm warning. This was early Sunday morning and plaintiff had not yet left for his weekly Sunday visit to Lake Las Vegas. Officer Guess arrived on the property with another officer from the Henderson Police Department. They saw plaintiff sitting on a bench and told plaintiff to put his hands behind his back while officer Guess began to search him. Another officer took plaintiff's identification and ran it for priors and outstanding warrants. The owner soon after arrived and yelled "I forgot that he was here he's my security guard release him!" Officer Guess released the plaintiff and the other officer gave plaintiff back his identification. Officer Guess thanked plaintiff for his cooperation.

At this point plaintiff informed officer Guess that officer Scoble had ordered plaintiff off the property in the morning times. Officer Guess then stated; "if the owner says you can be on his property officer Scoble can't order you to do anything." Officer Guess then called the incident in to headquarters and they gave her a reference number to give to plaintiff. #150405000160 (Exhibit A). Officer Guess then informed the plaintiff that if plaintiff had any further problems with the police about being on the

3

property that plaintiff was to give them this reference number that they could call in and get an 'all clear'. Plaintiff was appreciative of Officer Guess assistance and understanding. After it was discovered that the alarm was a false alarm plaintiff spoke to the owner for a minute then left for Lake Las Vegas.

On April 23, 2015 around 8:30pm plaintiff was approached on the property by two unknown Henderson Police Officers. The Officers told plaintiff that he was not allowed on the property and that he was illegally camping. Plaintiff gave the officers the reference number and they called it into headquarters. Headquarters gave the officers the 'all clear'. The officers told plaintiff that although plaintiff had authority to be on the property his lying in a horizontal position upon a bench constituted camping. The Officer that was with him stated "stay out of sight and out of mind" then they left.

On April 24, 2015 Officer Scoble arrived at 5:30 in the morning. Officer Scoble stated that He had been out to the property a few times and other officers had been out to the property and that he had already warned plaintiff about being on the property. The fact that plaintiff was still there forced him to write plaintiff a citation for camping without permission. Officer Scoble also informed the plaintiff that "he could arrest plaintiff, but that would be a bit extreme so he was just going to write the plaintiff a ticket for camping. Plaintiff tried to explain that the two officers had been there earlier and called in the reference number to get the 'all clear' but officer Scoble replied; "don't you think that I have already spoken to them about you?" Officer Scoble then told plaintiff;  "the city of Henderson wants plaintiff off the property." Officer Scoble then proceeded to write plaintiff a ticket for camping (Exhibit B) and then he left the property.

When plaintiff appeared in court for the camping without permission citation plaintiff had to wait until his name was called to stand before the judge. While plaintiff was waiting the public defender represented three clients in order. Each time there was a certain amount for a fine. Each time the public defender addressed to the judge that the client agreed to a plea deal which amounted to approximately 50% of the stated fine.

While plaintiff lived in Los Angeles California, before he moved to New Jersey before relocating to Nevada, plaintiff was sitting idle in his car in a drive thru lane at a Jack in the Box with his lights off. Plaintiff noticed a police car sitting on the street adjacent to the restaurant. Plaintiff saw the police flash his headlights lights twice then plaintiff noticed his lights were not on so plaintiff turned on his lights. The police then came toward the plaintiff and asked plaintiff to step out of the car. They searched the plaintiff and handcuffed the plaintiff then placed the plaintiff in the back of a police vehicle while they took his identification and ran it for priors and outstanding warrants. An arriving officer then began to search plaintiff's car. Plaintiff asked the arresting officer why plaintiff was handcuffed and sitting in the back of the police vehicle. The officer responded; "I am out here by myself what do you want me to do? After it was discovered that plaintiff had no priors or outstanding warrants they issued the plaintiff a citation for driving without his lights on and released the plaintiff. Plaintiff later showed up to court to challenge the citation but the officers didn't show and the citation was dismissed.

While plaintiff lived in Los Angeles plaintiff was driving in Watts over to a friend's apartment. Plaintiff made a right turn and parked his car in front of his friend's apartment. Suddenly a Los Angeles Metro vehicle appeared behind the plaintiff with guns drawn and lights flashing. Officers Day and Hale told plaintiff to get out of his car and get up against the wall and assume the position. One Officer searched the plaintiff's person while the other officer searched the plaintiff's car. They then took plaintiff's California identification and ran it for priors and outstanding warrants. After they discovered plaintiff

4

had no priors or outstanding warrants they issued plaintiff a citation for an unsafe lane change. Plaintiff asked the officers why they searched him and his vehicle and ran his identification for priors and outstanding warrants over an unsafe lane change violation. They responded; "because you are black and a male and driving a red car and wearing a red t-shirt". Plaintiff later showed up in court to challenge the citation but the officers didn't show and the case was dismissed.

While plaintiff lived in Los Angeles, plaintiff was driving at night and approached a police stop. They let plaintiff drive thru and plaintiff made a left turn and approached a stop sign on a dark secluded road. Plaintiff slowed for the sign and then travelled two more blocks made a right and parked his car at a friend's home. Suddenly, from out of the shadows, three police cars surrounded plaintiff's vehicle with their lights flashing and their guns drawn. They informed the plaintiff that he didn't come to a complete stop at the stop sign and asked plaintiff for his identification. They ran plaintiff's identification for priors and outstanding warrants while plaintiff sat in his car for approximately fifteen minutes. After they discovered that plaintiff had no priors or outstanding warrants they issued plaintiff a citation for not coming to a complete stop at a stop sign.

> "And away we go!"
>
> Jackie Gleason   (The Honeymooners)

**Conspiracy to Violate Fourth Amendment Rights, Against Unwarranted Searches and Seizures, guaranteed through the Fourteenth Amendment Due Process Clause.**

### The Fourth Amendment

The right of the people to be secure in their persons houses papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized. "U.S. Const., amend IV."

Simply, the Fourth Amendments concern with reasonableness allows certain actions to be taken in certain circumstances whatever the subjective intent." Whren, 517 U.S. at 814. Also; "When a law enforcement officer has reasonable grounds for suspecting that a criminal suspect may be armed, he may pat down the outer layer of the suspect's clothing for weapons." Terry v. Ohio 392 U.S.1, 88 S. Ct 1968 20 I.Ed.2d 889 (1968). Plaintiff contends that he has continuously been stopped and searched by officers of the Henderson Police Department without reasonable suspicion or probable cause that he was currently or had in the past committed a felony.

While walking from his apartment in Las Vegas, to a convenience store around the corner from his apartment, plaintiff walked upon a dirt surface that spilled out into the street. Plaintiff walked upon the portion of dirt that was in the street. Suddenly plaintiff was approached from behind by a Las Vegas Police vehicle. Plaintiff was stopped and searched by the officer for walking in the street. The officer then asked plaintiff what his "street name" was and further inquired about his nonexistent "gang affiliations". Plaintiff was then forced to stand in front of the police vehicle with his hands upon the hood while the officer checked his identification for prior arrests and outstanding warrants. Plaintiff had no warrants and was soon after released and warned by the arresting officer never to walk in the street again.

While in the city of Henderson, on a Sunday morning Plaintiff was walking from Target down to the Casino to watch the NFC playoffs. Plaintiff cut thru the field in front of the library and walked past the Library entrance and down the walkway. Hidden behind the library lurked a Henderson Police Officer. Plaintiff was stopped by the officer and was told that the police had received reports about thieves trying to break into the library to steal copper and that plaintiff was being stopped because plaintiff walked too close to the Library when it was closed. The Officer asked Plaintiff for his identification and forced plaintiff to stand in front of the police vehicle with his hands placed upon the hood of the vehicle while the officer ran his identification for priors and outstanding warrants. After the officer discovered that plaintiff had no priors or outstanding warrants the officer released the plaintiff.

In the city of Henderson, while walking from the property on the sidewalk adjacent to the ice cream factory plaintiff witnessed a police vehicle approach the property from the side street. The vehicle stopped at the property entrance for a moment then sped straight toward the plaintiff. The Henderson police officer stopped the plaintiff and told plaintiff that he had received a report about thieves breaking into the buildings on the property and stealing copper. Plaintiff told officer that he worked security for the owner of the property and that he had neither heard of or witnessed anyone trying to break into any of the buildings on the property. The officer didn't believe plaintiff, then told plaintiff that plaintiff needed a written and signed statement from the owner to prove that plaintiff actually worked as security for the property.

The officer then told plaintiff to empty out his pockets onto the hood of the police vehicle and then ordered plaintiff to sit on the curb with his hands behind his back while the officer checked his identification for priors and outstanding warrants. Plaintiff had an outstanding warrant in Las Vegas for missing a court date for a ticket plaintiff had previously received for being in a park unattended by a child. Plaintiff was taken into custody and driven to the Las Vegas border and transferred to a Las Vegas police officer. Plaintiff was taken to the Las Vegas City Jail where plaintiff spent two weeks incarcerated.

No right is held more sacred, or is more carefully guarded, by the common law than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law Union Pac R. Co v. Botsford, 141 U.S. 250, 251(1891). See also Beck v. Ohio, 379 U.S. 89 (1964); See also Rios v. United States, 364 U.S.253 (1960); see also Henry v. United States, where the Court noted: common rumor or report, suspicion, or even "strong reasons to suspect" was not adequate to support a warrant for arrest and that principle has survived to this day. 361 U.S. 98 (1959); See also Unites States v. Dire, 332 U.S. 581 (1948); see also Carroll v. United States, 267 U.S. 132 (1925).

Plaintiff was stopped, searched and arrested for walking on the sidewalk, for walking too close to the library and for walking on the street next to the curb. None of these circumstances give rise to reasonable suspicion or probable cause that plaintiff was armed, had committed a felony, was about to commit a felony or that plaintiff had a prior record or outstanding warrants. They were simply pretextual reasons given in order to justify the violation of plaintiff's Fourth Amendment Rights against the unwarranted and unreasonable search and seizure of plaintiff's person. In Scott v. United States, the Court noted that Fourth Amendment reasonableness is predominantly an objective inquiry. We ask whether the circumstances viewed objectively justify the challenged action. 436 U.S. 128, 138 (1978). See also Bond v. United States, "the Fourth Amendment regulates conduct rather than thoughts." 529

6

U.S. 334 N.2 (2000): [and it promotes evenhanded, uniform enforcement of the law. Devenpeck v. Alford, 543 U.S. 146, 153-154 (2004).

We turn then to question whether prudent men in the shoes of these officers would have seen enough to permit them to believe that petitioner was violating or had violated the law. Brinegar v. United States, 338 U.S. 175. In Carroll V. United States 267 U.S. 132.  The Court held however, it would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor, and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search... Those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption, or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

In all the listed encounters with law enforcement, and more which have yet to be listed, plaintiff was illegally stopped, searched and arrested without reasonable suspicion or probable cause that he either had or was in the process of committing a crime. In every instance the officers used pretextual reasons for the initial stop in violation of plaintiff's Fourth Amendment Right against unwarranted searches and seizures.

"The Art of the Deal"

Donald Trump

Pretext may be defined as the reasons assigned to justify an act, which have only the appearance of truth, and which are without foundation, or which if true are not the true reasons for such act. "Pretext" A Law Dictionary, Adapted to the Constitution and Laws of the United States. By John Bouvier. 1856. 11 June 2015.  A pretextual stop occurs when an officer stops a vehicle in order to conduct a speculative criminal investigation unrelated to the driving, and not for the purpose of enforcing the traffic code. State v Nichols, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007).  The court should consider "the totality of the circumstances, including both the subjective intent of the officer as well as the objective reasonableness of the officer's behavior. State v. Ladson, 138 Wn2d at 359.

Approximately a year and a half ago the owner entered the property in the morning and asked plaintiff to help him move some merchandise into the buildings. Plaintiff agreed and was financially compensated by the owner for plaintiff's labor. The buildings on the property are equipped with an elaborate alarm system that initiates a loud beeping sound whenever anyone crosses the threshold of the doorways and places a single step within. If one of the structures where ever breached, so that criminals could move the merchandise to the side in order to loudly bang holes into the walls to get to the copper, the alarm company would immediately notify the owner and the owner would call the police to the property.

One day plaintiff was on the property getting a few things organized when a resident saw plaintiff walking about the property. The resident asked plaintiff what he was doing on the property? Plaintiff informed the resident that he was the new security for the property. The resident had owner's phone number and called the owner to check out plaintiff's claim. Shortly thereafter the owner arrived upon the property and informed plaintiff that the resident had called him about the plaintiff. The owner also told the plaintiff that he informed the resident that plaintiff was the new security for the property.

7

The first time Officer Scoble of the Henderson Police Department invaded the property he told plaintiff that he was there because he received a report that someone was trying to break in and steal copper from the unoccupied buildings, which by this time were full of merchandise. Plaintiff told Officer Scoble that he was hired by the owner to secure the property. Officer Scoble told plaintiff that plaintiff was lying and asked plaintiff for his identification and proceeded to check plaintiff for priors and outstanding warrants. Plaintiff had no warrants and officer Scoble told plaintiff that he was going to check out his story and if it were untrue he would be back to arrest the plaintiff for illegally camping on private property.

Unless an individual is trespassing upon the property only one resident can actually see on to the property and she has the owner's phone number. No one called the police to report anything. This story about receiving reports about copper thieves is a contrived storyline created to justify their illegal invasions of the property. They are like salesmen using the art of the pretext to overcome sales objections.

Gang detectives stop vehicle for traffic infraction in order to investigate drug dealing. State v. DeSantiago, 97 Wn. App. 446, 983 P.2d 1173 (1999). Officer watching narcotics trafficking building stopped car to identify driver who had left the location. State v. Myers, 117 Wn .App. 93, 69 P.3d 367 (2003). Officer who suspected driver's license was suspended stopped vehicle for traffic citations while awaiting record check on license status. State v. Perkins, 760 So.2d 85 (Fla. 4/27/00). Council ineffective for not challenging stop where officer who suspected vehicle might have been stolen made traffic stop for infractions. State v. Meckelson, 133 Wn. App. 431, 135 P.3d 991 (2006).  See also State v. Montes-Malindas, 144 Wn. App 257-262 where the officer admitted that suspicions of criminal activity where probably on his mind when he stopped a van. The Court concluded that the stop was pretexual after considering the totality of the circumstances, including both the subjective intent of the officer and the objective reasonableness of his behavior. Id at 262.

Plaintiff was stopped and searched for walking in the street, for walking down a sidewalk, for walking too close to the library and for being on a bench on the private property which plaintiff had contracted to secure. None of the above actions, by the plaintiff, give rise to reasonable suspicion or probable cause that plaintiff had or was about to commit a felony. None of the above actions give rise to reasonable suspicion or probable cause that plaintiff was armed. In truth, each of the described encounters which plaintiff had with the Henderson and Las Vegas police officers were the result of plaintiff's profile of a black person. These instances taken together reveal a pattern or practice of police authorities using discriminatory pretextual methods as an excuse to violate plaintiff's Fourth Amendment Rights against unwarranted searches and seizures afforded to the plaintiff thru the Due Process Clause of the Fourteenth Amendment.

In St Mary's Honor Center v. Hicks, the Court held it was permissible but not mandatory, for the trier of fact to make an ultimate finding of intentional discrimination once the plaintiff has established pretext. 509 U.S. 502 (1993) S.Ct.  In Reeves v. Sanderson Plumbing Products Inc., the court noted that "in appropriate circumstances the trier of fact can reasonably infer from the falsity of the explanation that the employer dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the fact finder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.

8

## Conspiracy

Nevada State Law defines the crime of conspiracy as "An agreement between two or more persons for an unlawful purpose." Doyle v. State, 112 Nev. 879, 894, 921 P.2d 901, 911 (1996). Also in Pinkerton v. United States, where the court defines coconspirator liability in terms of reasonable foreseeability and reaffirmed the concept that a conspiracy and the completion of the substantive offense are two distinct criminal acts. 328 U.S. 640 (1946).

Approximately two weeks before plaintiff was issued the camping citation from officer Scoble the owner called the police onto the property because the owner had just fired an employee who had possession of the keys to the buildings on the property and he was afraid that the recently fired employee would come to the property and steal from out of the buildings. The Henderson Police arrived moments before the owner. The gardeners had unlocked the chain to the entrance enabling the police to drive their vehicles onto the property. The Henderson Police witnessed plaintiff sitting on a bench and assumed plaintiff was there to steal something. A police officer asked plaintiff to turn around and put his hands behind his back and proceeded to search plaintiff for weapons while another officer ran plaintiff's identification for priors and outstanding warrants.

At that instant the owner arrived and informed the police that he had forgotten that plaintiff might still be on the property at that time and that plaintiff was the security for the property and to release the plaintiff. The Police released plaintiff and gave plaintiff back his identification and thanked the plaintiff for being cooperative. Plaintiff then informed Officer Guess that the Henderson Police had entered the property on multiple occasions and they never believed that plaintiff was hired by the owner to secure the property. Plaintiff then informed officer guess that Officer Scoble told plaintiff that plaintiff couldn't be on the property during the day time. Officer Guess then told plaintiff that "as long as plaintiff had the owner's permission to be on the property Officer Scoble couldn't tell plaintiff what to do." Officer Guess then called headquarters and acquired the reference number 150405000160, which she gave to plaintiff. Officer Guess told plaintiff that if the police should show up again just give them the reference number so they can call it in and get an 'all clear'.

The night before plaintiff received the camping citation from officer Scoble, two Henderson Police officers, which plaintiff had never seen before, invaded the property and approached plaintiff. They informed plaintiff that they had received a report from a resident of a suspicious character walking on the property. They then informed plaintiff that he couldn't camp on the property. They then took plaintiff's social security number and ran it for priors and outstanding warrants. Plaintiff told the officers that he was the security for the property and had permission to be there from the owner. Plaintiff then told the officers that the Henderson Police had already given plaintiff a reference number so that they could call it in and get an 'all clear'. They called in the reference number and got an 'all clear' from headquarters. They then told the plaintiff that "we got the all clear, but that plaintiff still couldn't lie down on the bench because that's camping." They told plaintiff to keep out of sight and out of mind then they left the property visibly upset.

At 5:30 the next morning Officer Scoble invaded the property again without a warrant. He approached plaintiff and told plaintiff that several officers had come upon the property and told plaintiff that he was illegally on the property. Plaintiff attempted to give Officer Scoble the reference number for him to call in and get an 'all clear' but Officer Scoble told plaintiff that; "he wasn't interested in anything plaintiff

9

had to say and that he could arrest the plaintiff but that would be a little extreme so instead he was
going to give plaintiff a camping citation."

Plaintiff then told Officer Scoble that two officers were on the property earlier and they got an 'all
clear' for plaintiff's presence on the property. Officer Scoble then replied "don't you think I've already
spoken to them about you? The city of Henderson want's you off the property." Officer Scoble then
handed plaintiff the camping citation and said good luck and walked off the property.

In Garner v. State, the Court noted that evidence of a coordinated series of acts furthering the
underlying offense is sufficient to infer the existence of an agreement and support a conspiracy
conviction. 116 Nev, 770, 780, 6 P.3d 1013, 1020 (2000). Officer Scoble told plaintiff that he had already
spoken to the two officers which had earlier illegally invaded the property. From this statement we may
infer that Officer Scoble was aware of the 'all clear' that the two officers had earlier received from
department headquarters before Officer Scoble re-invaded the property. Officer Scoble directly defied
the policy concerns of his own department and therefore we may infer that Officer Scoble was being
directed from a source higher than the authority of his department.

Officer Scoble, during his second invasion told plaintiff that he could stay on the property as long as
he wasn't there during the daytime, yet during his third invasion he stated that the City of Henderson
wanted plaintiff off of the property before he handed plaintiff the camping citation. From these facts we
may infer that, at least at the lowest level of the conspiracy, the City of Henderson instructed Officer
Scoble to take the described illegal and discriminatory actions toward the plaintiff. We may also infer
that the City of Henderson intends to use the City judicial apparatus to punish plaintiff and remove him
from the property. From the stated facts, we may also infer that every illegal invasion onto the property
by the Henderson Police Department was part of an elaborate conspiracy administered, at least in part
by the City of Henderson.

Where a person enters into a common plan or scheme he may be held criminally liable as an
accessory for unintended acts if in the ordinary course of things they were the natural or probable
consequence of such a common plan or scheme. State v. Cushing, 61 Nev. 132, 148, 120 P.2d 208, 216
(1941).

As plaintiff has previously noted, in the city of Las Vegas plaintiff has encountered the very same
pattern or practice of discriminatory pretextual methods of violating plaintiff's Fourth Amendment
Rights against unwarranted searches and seizures and discriminatory violations of plaintiff's
fundamental rights guaranteed by the Fourteenth Amendment Due Process Clause. In this light we may
infer that at least the Las Vegas Police Department and County Marshals are involved in the very same
or at least similar discriminatory conspiracy.

Plaintiff has also previously noted that he was illegally stopped and searched by a Henderson Police
officer who was aware of plaintiff's outstanding warrant before he arrested plaintiff. Plaintiff was then
transferred to the Las Vegas police and taken to the Las Vegas City Jail. From this evidence we may infer
that the City of Henderson Police Department and the Las Vegas Police Department work in cooperation
to further the very same broad discriminatory conspiracy.

While plaintiff lived in the City of Los Angeles California, plaintiff was riding to a friend's home in the
city of Watts. Plaintiff made a right turn and parked his car. Suddenly two cops, Officers Day and Hale,

10

emerged out of a police vehicle and pointed their guns at the plaintiff and told plaintiff to assume the position against a wall. One officer, a Black male, searched plaintiff's person while the other officer, a European female searched plaintiff's car. They then ran plaintiff's California identification for priors and outstanding warrants. After discovering that plaintiff was clean they issued plaintiff a citation for an illegal lane shift.

Plaintiff, highly upset, then asked the officers why they pointed their guns at him searched him and searched his vehicle for an illegal lane shift? They told plaintiff that it was because plaintiff was a young black male driving a red car and wearing a red t-shirt. Plaintiff later went to court to challenge the ticket but the case was dismissed because the officers didn't show in court.

While in the city of Hawthorne California, plaintiff was waiting in a drive thru lane to pick up food at a Jack in the Box. Out of nowhere a Hawthorne police officer drove from of the street and on to the restaurant lot and told plaintiff that he was driving without his lights on. The officer handcuffed plaintiff and placed him into the back of his squad car while another arriving officer searched plaintiff's car. Plaintiff asked the officer why plaintiff was sitting in the back of the squad car hand cuffed. The officer replied, "I am out by myself what do you want me to do?" Plaintiff was later released and given a citation for driving with his lights off while idling in a fast food drive thru lane. Plaintiff later went to court to challenge the citation but the case was dismissed because the officer didn't show.

While living in Los Angeles plaintiff was riding on the highway at night when he approached a police stop. Plaintiff was checked and allowed to pass thru and made a left turn headed to a friend's apartment on a dark deserted street. Plaintiff slowed at a stop sign then drove a few blocks, made a right and parked. Out of nowhere, three police cars flashing lights and guns drawn surrounded plaintiff's car. They asked plaintiff for his identification and checked for priors and outstanding warrants. They found no warrants and gave plaintiff a citation for not coming to a complete stop at a stop sign. In every instance plaintiff has listed the truth that he asserts can be traced thru police communications utilizing his social security number and California and New Jersey identification numbers.

The City of Los Angeles police force and judicial apparatus have displayed an identical pattern or practice of illegal discriminatory pretextual violations of plaintiff's Fourth Amendment rights against unwarranted searches and seizures and plaintiff's fundamental rights guaranteed by the Fourteenth Amendment Due Process Clause, as the cities of Henderson and Las Vegas Nevada. Yet these identical pretextual discriminatory practices took place in different states. From these facts we may infer that the cities of Los Angeles California, Henderson and Las Vegas Nevada are all part of a broader conspiracy coordinated and administered by a higher than State form of government. Therefore, we may also infer that this conspiracy to discriminate against individuals who fit a certain minority profile may be found at its source within the Federal Department of the United States Government. "Though the 5th Amendment does not contain an Equal Protection Clause, as does the Fourteenth Amendment which applies only to the states, the concepts of Equal Protection and Due Process are not mutually exclusive." Boiling v. Sharpe, Case law, 1p findlaw.com 1954-05-17.

11

**Conspiracy to Violate the Fundamental Right of Liberty**

"That's Ludacris!"

Iron Mike Tyson

World Heavyweight Champion

With Incorporated Substantive Due Process, plaintiff may state a claim by proving a violation of one of the Bill of Rights. The Supreme Court has held that one of the substantive elements of the Due Process Clause protects those rights that are fundamental rights that are implicit in the concept of ordered liberty and has over time held that virtually all of the Bill of Rights protect such fundamental rights and has likewise held that they apply to the states through the Liberty Interest of the due Process Clause. Palko v. Connecticut, 302 U.S. 319, 325 (1937).

Plaintiff was at Mccaraan Airport walking down from the parking garage toward the bus stop. Suddenly three unmarked vehicles appeared from out of nowhere flashing lights. They surrounded plaintiff and told the plaintiff to put his hands behind his back while they searched his person. Plaintiff asked what this was all about? One officer told plaintiff that they had received reports about someone trying to steal luggage from out of the airport and that plaintiff fit the description of the suspect.

Plaintiff told them that he had not even been inside the airport on that day and that he was sleeping in his van which got stuck at the airport and plaintiff had no money to get it out. Plaintiff was forced to stand in front of the police vehicle with his hands upon the hood while the officers checked his identification for priors and outstanding warrants. Plaintiff didn't have any warrants so the officers released plaintiff and told plaintiff to leave the airport grounds and not to sleep in his van anymore. Plaintiff quickly complied with the order.

As with the previously stated encounters, the officers contrived a pretextual excuse to stop, search, arrest and check the plaintiff for priors and outstanding warrants because plaintiff matched the preconceived criminal profile of a black person. Plaintiff has the right to sit at a bus stop at the airport like all other citizens without the threat of arrest. Just as plaintiff has the right to walk on the sidewalk or close to the library when it's closed without the threat of arrest just like any other citizen.

The right not to be deprived of liberty without due process of the law "no person may ever be physically assaulted, intimidated, or otherwise abused intentionally and without justification by a person acting under the color of the laws of any state." United States v. Bigham 812 F.2d 943, 949 (5th Cir. 1987). With substantive due process simpliciter the plaintiff must show that defendant engaged in conduct that was arbitrary, or conscious shocking in a constitutional sense. Collins v. City of Harker Heights Texas, 503 U.S. 115, 128 (1992). See also Rymer v. Douglas county, 764 F. 2d 796, 801(11th Cir. 1985).

In accordance with the Due Process guarantees of the Fourteenth Amendment Plaintiff has the constitutional expectation of the fundamental right of liberty. On numerous occasions plaintiff's right to liberty has been violated by the Henderson, Las Vegas and Los Angeles police departments. On Numerous occasions, some previously listed, plaintiff has been stopped searched confined or arrested without reasonable suspicion or probable cause that plaintiff was armed or had committed a crime in violation of plaintiff's fundamental right of liberty. Plaintiff's encounters with various police officials in

12

the cities of Las Vegas, Henderson and Los Angeles reveal a pattern or practice of discriminatory pretextual violations of plaintiff's fundamental right to liberty.

### Conspiracy to Violate the Fundamental Right of Privacy

Within the language of the Fourth Amendment of the United States Constitution there exists an implied fundamental right to privacy noted within the Bill of Rights. This right to privacy is afforded to the plaintiff thru the Due Process Clause of the Fourteenth Amendment.

It is not enough that an individual have a subjective expectation of privacy. Rather the expectation must be one "which the law recognizes as legitimate." Rakas v. Illinois, 439 U.S. at 144 n.12. To be legitimate the expectation of privacy must be objectively reasonable: it must flow from "a source outside the Fourth Amendment. Either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Carter, 525 U.S. at 88. See also Bonner v. Anderson, 81 F.3d 472-475 (4th Cir 1996).

In accordance with the concept of real property law a purchaser or owner of real property inherently controls a bundle of rights. He may sell, lease, rent, etc., etc., his interest in real property. The owner of the Calico Ridge property contracted with the plaintiff to give plaintiff the right to possess the property in order so that plaintiff could secure the property from the criminal element. Plaintiff has been given full authority to verbally remove all trespassers from the chained off unoccupied property.

Many social guest entrust their host with the safety and security of both their persons and their belongings. An overnight guest, for example, seeks shelter in another's home "precisely because it provides him with privacy, a place where he and his possessions will not be disturbed." See Olson, 495 U.S. at 99. Plaintiff contracted to secure owners property. There was offer, acceptance and consideration within these dealings. Plaintiff would secure owners property and plaintiff would receive authority over the property so that plaintiff could safely store his belongings in a private secure area. This transfer of the right to possession negotiated within the terms of the employment contract affords plaintiff the very same legitimate expectation of privacy maintained by the owner of the property.

"I'll be back"

Arnold Schwarzenegger (Terminator)

The first time officer Scoble invaded the property without a warrant he stated that he was there because he received reports that someone was trying to steal copper out of the structures which were filled with merchandise. The second time he invaded the property without a warrant accompanied by Officer Anderson at 3:30 in the morning, he gave no reason for being on the property without a warrant. He simply stated that he and the plaintiff both knew that plaintiff didn't have permission to be on the property but that it was alright with him. He stated that plaintiff was out of the way in the corner and quiet and wasn't bothering anybody and having plaintiff on the property was a deterrent to criminals entering the property and threatening the neighborhood in general. As long as plaintiff was off the property during the day time Officer Scoble was alright with plaintiff's presence on the property.

The night before Officer Scoble issued plaintiff a citation for camping two officers which plaintiff had never seen before invaded the property without a warrant. They said that they were there because a resident had reported someone suspicious walking on the property. The third time officer Scoble

13

invaded the property at 5:30 in the morning without a warrant he gave no reason for being there without a warrant. He simply stated that officers had been on the property earlier and told plaintiff to leave and plaintiff was still there. Therefore he said that he was there to issue plaintiff a citation for camping. In these instances, and others not mentioned, Plaintiff's privacy rights afforded by the Fourth Amendment thru the Fourteenth Amendment Due Process Clause were violated by the Henderson Police Department using pretexts as justification for their illegal presence.

Around a year and a half ago owner asked plaintiff to help him move merchandise into the buildings for storage purposes. On occasion owner continues to move merchandise into the building for which plaintiff is available to help and receive monetary compensation. Therefore the very notion of some thief moving merchandise out of the way in order to loudly bang a hole into the wall to steal copper is inconceivable.

Plaintiff has been invaded upon the property without a warrant by several different Henderson Police officers during his employment at the property over the past two and a half years. Each time the officers used the same pretextual excuses for invading a roped off private property with "No Trespassing" signs and Security Camera warnings posted in multiple clearly visible areas. Either they explain that they are present because they received a report that someone was trying to break in and steal copper or that a resident saw someone suspicious walking about the property.

The building structures are aligned in such a way that only one resident has a partial view of a very small corner of the property which is acres in total area. Shortly after plaintiff began securing the property the one resident spotted plaintiff walking into the very small visible area. The resident asked plaintiff what he was doing on the property. Plaintiff told resident that he was the new security for the complex. The resident then responded that she had the owner's phone number and was going to call him to check out plaintiff's story. After around two hours had passed the owner arrived on the property. The owner informed plaintiff that the resident had called him and that he assured her that plaintiff was on the property to secure it. Owner then informed plaintiff that plaintiff had total dominion and control over the property in his absence and that all entrances were roped off and that not even the police could enter the property unless the owner or plaintiff alerted them to be there.

No one called into report that plaintiff was walking around the property. The only resident that could have done so has known that plaintiff has been on the property with the owner's permission for over two years. No one tried to break into any of the structures, filled with merchandise, to steal copper out of the walls. The Police just needed an excuse to come on to the property so that they could threaten and harass plaintiff with a camping violation which is in itself a pretext to the removal of the plaintiff from the property.

Justice Harlan's concurring opinion summarizes the essential holdings of the majority. "That an enclosed telephone booth is an area where, like a home, and unlike a field, a person has a constitutionally protected reasonable expectation of privacy, that electronic as well as physical intrusion into a place that is in this sense private may constitute a violation of the Fourth Amendment and an invasion of a constitutionally protected area by federal authorities is, as the court has long held presumptively unreasonable in the absence of a search warrant." White welsh and James J Tomkovicz, Criminal Procedure, Constitutional Constraints upon Investigation and Proof. Newark N.J. Lexis Nexis Mathew Bender.

14

Clearly, on multiple occasions, the Henderson police department violated plaintiff's fundamental right to privacy guaranteed by the Fourth Amendment thru the Due Process clause of the Fourteenth Amendment. Therefore any evidence of plaintiff camping is inadmissible. In Mapp v. Ohio, 367 U.S. 643, 81 S.CT 1684, 6 L Ed. 2d 1081 (1961) Police forcibly entered suspects home in search of a bombing suspect. The Court found that the Fourteenth Amendment right to due process of the law and the Fourth amendment right against unreasonable searches and seizures could not be properly enforced as long as illegally obtained evidence continued to be presented in court.

The Court noted that the entry was not done in good faith. Also in Katz v. United States, 389 U.S. 347, 88 S. Ct 507, 19 L. Ed 2d 576 (1967), where the suspect used a public phone booth to transmit illegal gambling wages while the FBI was recording his conversations. Justice Stewart noted that government activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and constituted a search and seizure within the meaning of the Fourth Amendment. One who occupies a telephone booth, shuts the door behind him and pays a toll that permits him to place a call is surely entitled to assume that the words he utters into the mouth piece will not be broadcast to the world.

The Henderson police utilized pretextual reasons to justify their invasion of the private property in which plaintiff had negotiated the right of possession. Clearly on multiple occasions the Henderson Police violated plaintiff's fundamental right to privacy.

### Conspiracy to Violate the Fundamental Right to Travel

In Dunn v. Blumstein 405 U.S. 330, 334 (1972), the court stated; In as much as the right to travel is implicated by state distinctions between residents and nonresidents, the relevant constitutional provision is the privileges and immunities clause, Article IV, Sec 2, cl. 1.  Also in Saenz v. Roe, 526 U.S. 489 (1999), the court noted "For the purposes of this case we need not identify the source of [the right to travel] in the text of the Constitution. The right of free ingress and regress into neighboring states which was expressly mentioned in the Article of Confederation, may simply have been conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created."

Plaintiff contends that defendants have revealed a pattern or practice of discriminatory predicate acts perpetrated by three different police departments in three different cities within this country. Plaintiff also contends that these predicate acts were done in furtherance of a nationwide conspiratorial racket profiting from the targeted incarceration of black people and people of color in general.

In Heart of Atlanta, the court stated that restrictions for public accommodations for black Americans severely interfered with interstate travel. Id. Plaintiff's facts differ from that of Heart of Atlanta in that Heart of Atlanta dealt with local individual acts of discrimination and the burdensome effect the accumulation of individual acts of discrimination have on interstate travel. Plaintiff asserts that a nationwide systemic discriminatory conspiracy carried out by public officials within the legislative, judicial and executive arms within the local, city, county and state governments has a much more burdensome effect on interstate travel regarding the targeted groups.

Such a conspiracy goes beyond the denial of interstate accommodations. This conspiracy threatens the fundamental liberty interests of black citizens and citizens of color in general. Thus deterring travel either to or thru a state or local community engaged in this conspiratorial racket. Plaintiff has no interest

15

in ever returning to the state of California for this reason and if plaintiff could afford to leave Nevada he would have left yesterday. However, plaintiff asserts that this discriminatory scheme is spread throughout the entire nation therefore plaintiff has no place within this nation in which to travel. This nationwide discriminatory racket is in clear violation of plaintiff's fundamental right to travel within the United States.

Paul v. Virginia 75 U.S. (8 Wall.) 168, 180 (1868). ("Without some provision...removing from citizens of each state the disabilities of alienage in other States, and giving them equality of privilege with citizens of those States the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists.").

### Conspiracy to Violate the Fundamental Right to Work

Universal Declaration of Human rights (1) Everyone has the right to work, to free choice of employment, to just and favorable conditions of work and to protections against unemployment. (United Nations General Assembly).

We do not need the United Nations to clarify any rights held by the citizens of this country. The fundamental right to work is implied within the direct language of the Constitution.

(Article 1. Section 2.): Representatives and Direct taxes shall be apportioned among the several States which maybe included within this Union, according to their respective Numbers, which shall be determined by adding to the whole number of free Persons, including those bound Service for a Term of Years, and excluding Indians, not taxed, three fifths of all other Persons. The term 'free Persons' signified Western European males and the term 'other Persons' signified slaves and of course Indians signified Native Americans. The founders of the Constitution totally discounted the European female.

#### "Pennies from Heaven"

The term Direct tax, in a constitutional sense, may be defined as land taxes. It really doesn't matter, the point is that individuals must pay them. Article 1. Section 2. implies that free Persons had a fundamental right to own land. Free Persons also had a duty to pay direct Taxes on the land they owned. Unless there is some kind of mystical money tree around here somewhere free Persons have the fundamental right to labor in order to earn money not only to purchase real estate but also to fulfill the duty to pay taxes on said real estate. The Fourteenth Amendment erased any distinction between the rights of European males and those of former slaves so that these two groups both have the implied Right to Work afforded by the United States Constitution.

When plaintiff initially arrived in the city of Henderson plaintiff contracted with the owner of the Calico Ridge property to secure his property and the merchandise within the structures of the property. There was offer, acceptance by the plaintiff and consideration for both parties. Plaintiff has asserted that on multiple occasions the Henderson Police have attempted to force plaintiff off of the property. When Officer Scoble cited plaintiff for camping he stated that "the city of Henderson wanted plaintiff off of the property." The city government and the executive police force seek to destroy the contractual relationship plaintiff has formed with the owner. Simply put, The City of Henderson and the Henderson Police Department are in open violation of Plaintiff's fundamental right to work.

16

**Conspiracy to Violate the Equal Protection Clause of the Fourteenth Amendment**

In Lawrence v. Texas, the Supreme Court noted equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects and a decision on the latter point advances both interests. 539 U.S. 598 (2003) at Pg 2482. See also, Boiling, Id.

Plaintiff was searched and forced to stand in front of a police vehicle while the police, at Mccarran Airport ran his identification for priors and outstanding warrants. Plaintiff was made to sit on the curb while the Henderson Police checked his identification for outstanding warrants and priors in Calico Ridge. Plaintiff was later released and told by the Henderson Police that he would be arrested if he ever returned to the Calico Ridge Neighborhood. Plaintiff was forced off the property under the threat of arrest by a Henderson police officer. Plaintiff was evicted from Lake Las Vegas by the maintenance manager for reading the Bible on Easter Sunday during Passover. Also, Officer Scoble of the Henderson Police Department threatened plaintiff with arrest for being on the property.

These events taken together reveal a pattern or practice of discriminatory profiling of the plaintiff by the Las Vegas and Henderson police departments. Although it does not conclusively prove it, even if the wrongdoer did not act pursuant to a state statute the plaintiff may still show that the defendant acted pursuant to a custom or usage that had the force of law in the state. Adickes v. S.H. Kross & Co., 398 U.S. 144, 90 S.Ct 1598, 26 L Ed. 2d 142 (1970).

Not only is the plaintiff guaranteed Fourth Amendment rights against unwarranted searches and seizures and certain fundamental rights listed in the Bill of Rights thru the Due Process Clause of the Fourteenth Amendment but plaintiff also has the guarantee that the law be applied equally throughout society by the Equal Protection Clause of the Fourteenth Amendment. In Adickes, plaintiff was able to prove that she was refused service in a restaurant due to her race because of a state enforced custom of racial segregation, even though no state statute promoted racial segregation in restaurants. Id. Our facts suggest that there is no state statute promoting the profiling of black citizens by police yet there is a state enforced custom of profiling blacks and Latinos by police.

In Brown v. Board of Education, 347 U.S. 483 (1954), the court explained that the segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law, for the policy of separating races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of the law, therefore has a tendency to retard the educational and mental development of negro children and deprive them of some of the benefits they would receive in a racially integrated school system.

This discriminatory and illegal practice of profiling individuals belonging to certain minority groups denotes an inferior status of the targeted minority groups. This sense of inferiority has a tendency to retard the sense of belonging and unity with the controlling majority and deprive them of some of the benefits they should be receiving in a racially integrated society. Affecting their overall motivation to contribute to the health and wellbeing of the nation. These discriminatory practices tend to erode the cohesive purpose and plan of our national identity. This brand of illegal profiling stands in direct violation of the spirit and intent of the Equal Protection Clause of the Fourteenth Amendment.

17

**Conspiracy to Violate the Felony Component of the Thirteenth Amendment of the United States Constitution**

*Then the Lord said unto Moses, go in unto Pharaoh, and tell him, Thus saith the Lord God of the Hebrews, let My people go, that they may serve me.*          Exodus 9:1

Thirteenth Amendment

Section 1. Neither slavery or involuntary servitude, except as punishment for a crime where one has been duly convicted, shall exist within the United States or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation.

The language of the Thirteenth Amendment states that the institution of slavery has been abolished in the United States except in the case where a person has been convicted of a crime. The term crime within the language of the Amendment taken in context with the intent of the authors of the Amendment can only be translated as a felony crime. Therefore, slavery is still in existence as a constitutional punishment for felony convictions. The Constitutional Power behind this nation's modern day prison industrial complex lies within the express language of the Thirteenth Amendment Felony Component.

Plaintiff has provided the Court clear proof that the cities of Henderson Nevada, Las Vegas Nevada and Los Angeles California are involved in an elaborate discriminatory conspiracy utilizing pretextual devices to violate the Fundamental Liberties afforded to certain minority groups by the United States Constitution. Plaintiff contends that there is not only a discriminatory motive behind the conspiracy but a financial motive as well. Plaintiff also contends that the prison systems of the cities and the entire prison industrial complex lie at the center of this discriminatory conspiracy.

Sometime during the late seventies and early eighties county jails started popping up within the cities of this great nation of ours. After the social gains of the Civil Rights Movement this nation underwent a policy shift towards black Americans and people of color. Wicked individuals figured it would be profitable to incentivize the incarceration of black Americans especially those black Americans living in the cities of this nation. City, State and Local governments receive compensation from the Federal Government for the number of bodies they maintain in prisons. Beds, staffing, per diems all add up to big business.

Christopher Petrella, a University of Berkeley graduate student, produced a study "The Color of Corporate Corrections". http://journal.radicalcriminology.org/index.php/rc/article/view/27. Within the study he found that one in three black men will spend time behind bars during their life time. Compared with one in six Latino men and one in seventeen white men. Arrest rates for marijuana possession are four times as high for black Americans as for white Americans. Black men spend an average of twenty percent longer behind bars in Federal prisons than their white peers for the same crimes. In light of this raw data the question must be asked; are black Americans and white Americans both citizens of the same America?

Mr. Petrella went on to state that these reports and thousands of others have the cumulative effect of portraying a criminal justice system that disproportionately incarcerates black Americans and people of color in general. Also, beyond the historical overrepresentation of people of color in county jails and

18

federal prisons Petrella found people of color are further overrepresented in private prisons contracted by the Department of Corrections in Arizona, California and Texas. This would mean that the racial disparities in private prisons housing state inmates are even greater than in publically run prisons.

Mr Petrella also cited these staggering private prison revenue numbers. Corrections Corp of America stated 1.7 Billion in revenues in the year 2011. The GEO Group, another private prison corporation, stated 1.6 Billion in revenues in the year 2011. These are just the numbers for private prisons. The revenues for city, county state and federal prisons must be unbelievable. There is a county in Virginia where the prisons are at 280 % capacity and they are scheduled to build 5 new prisons. Kaleif Browden, at the age of 16, was arrested and charged with stealing a back pack. He spent three years at Rikers Island without being convicted of a crime. He was raped multiple times. These rapes where coordinated and encouraged by prison officials. He later committed suicide.

Plaintiff has been to jail in the city of Las Vegas Nevada. Ninety percent of the inmates were of Black and Latino heritage.  Plaintiff contends that the named cities and states, and every other city and state across this great nation of ours, are involved in a grand conspiracy to violate the constitutional rights of certain minority groups in order to fill the jails and receive federal compensation. In other words, what we have is a nationwide illegal discriminatory racket. The police are trained to run grifts in unison with the judicial apparatus and the local prison system and here are a few examples.

When plaintiff went to court to deal with the citation he had received for being in a park unattended by a child in Las Vegas, plaintiff was also there to deal with a citation he had received for loitering at the airport. It was hot and plaintiff was just looking for some air conditioning.  While at the Las Vegas Court House plaintiff discovered that the loitering citation had been dismissed yet the park citation was postponed. This forced plaintiff to come back to the same court on another day which plaintiff was unable to do and received a warrant. Plaintiff fell into the planned program. Court appointments are postponed with the hope and intent that the individual will miss the reassigned court date and generate a warrant against him. They could never have justified incarcerating plaintiff for his first offense of some law half the country has never even heard of but a warrant for a nonappearance always justifies incarceration which means that one more bed will be filled and the city will be compensated.

While plaintiff was in a park in Las Vegas, unattended by a child, plaintiff was handcuffed and placed in the back seat of a police vehicle while the police ran plaintiff's identification for priors and outstanding warrants. Plaintiff was imprisoned. Plaintiff was released from police custody and given a citation after the police discovered that plaintiff had no record nor any outstanding warrants. The park in question had notification that the park was a child's park all over the park gates around the entire park. Half the park is occupied by a homeless community during the day. The park is divided by a fence. The local custom is to allow the homeless to occupy half the park during the day and the other half is a child's park. Plaintiff came upon this revelation while being handcuffed and arrested at the park.

The restroom, which plaintiff had observed in the past, is frequently used by the homeless in the presence of Marshals looking on. Plaintiff had also observed the homeless, unattended by children, dwelling in the child's section in the presence of the Marshals. The Marshals pick and choose when and against whom they will enforce the child's park statute against. In other words, the Marshals utilize a brand of 'selective enforcement' of the law. If an individual matches a certain profile they will select to enforce the statute against them. They seek the greatest opportunity to fill a prison bed for the longest

19

period of time. The plaintiff matched the profile of a black person and the Marshal selected to enforce the statute against him.

While plaintiff was driving in Los Angeles plaintiff came upon a police stop. After a moment, plaintiff was allowed to pass thru then plaintiff made a left turn. Three blocks down plaintiff slowed to a stop sign. Plaintiff then drove three more blocks made a right and parked his car. Suddenly out of the darkness, the police surrounded plaintiff with lights flashing and guns drawn. Plaintiff contends that the first group of officers at the police stop saw that the plaintiff matched the profile of a black person and relayed that information to officers around the corner waiting in ambush using the pretext of plaintiff not coming to a full stop at a stop sign as justification for surrounding plaintiff at gun point. They thought that plaintiff was someone that he wasn't. They thought that they would fill another bed at the county jail.

Also, in Los Angeles Officers Day and Hale of L.A. Metro stopped plaintiff at gun point and searched him as well as his car for making an unsafe lane change. Ultimately they informed plaintiff that the reason they stopped him was because he was a black man riding in a red car. Plaintiff went to court to challenge the citation but the officers never showed and the citation was dismissed. This particular circumstance happens much more then it ought to. The police have a green light to violate the rights of profiled victims and when they come up with nothing they issue a bogus citation then don't show to court so it gets dismissed. Why is this practice allowed to continue? If an officer issues I citation and hales an individual into court shouldn't that officer then be responsible to justify the issuance? Why are they allowed to profile citizens whom they figure cannot afford legal aid to challenge the criminality of their actions? Why are they not being held accountable?

"There is a kind of innate feeling, a lingering hope among many in the South that slavery will be regalvanized in some shape or other. They tried by their laws to make a worse slavery than there was before, for the freedman has not the protection which the master, from interest gave him before". J.J. Gries, to the Joint Committee on Reconstruction. Quoted in Du Bois Black Reconstruction. (1935), p. 140.

Black people and people of color are profiled stopped and searched then given these misdemeanor citations which were based upon illegal and discriminatory pretexts. The pattern or practice of profiling by police officers is the modern day equivalent of the outlawed 'black codes' of the bygone southern reconstruction era. The Felony Component of the Thirteenth Amendment was not designed as a punishment for misdemeanor offenses. The Authors of the Amendment meant for slavery to be a punishment only for the most heinous crimes. Murder, arson, rape crimes of this magnitude. They never intended to return former slaves to a state of peonage for J-walking. Therefore, the practice of incarcerating anyone, no matter their color, for any misdemeanor offense violates the spirit of the Felony Component of the Thirteenth Amendment.

Tsesis, The Thirteenth Amendment and American Freedom (2004). Pp 112-113. "The Thirteenth Amendment remains the principle constitutional source requiring the federal government to protect individual liberties against arbitrary private and public infringements that resemble the incidents of involuntary servitude. Moreover, the Thirteenth Amendment is a positive injunction requiring congress to pass laws to that end. While the Fourteenth Amendment is 'responsive' to unconstitutional behavior."

20

Plaintiff also asserts that the prison racket is based upon the principle of incarcerating the descendants of slaves for profit. The Thirteenth Amendment was enacted for the very purpose of freeing slaves from incarceration. Therefore, this wicked discriminatory conspiracy works to undermine the Power and Purpose of the Thirteenth Amendment standing as a pronounced vestige of slavery and is in direct violation of the Constitution.

### Conspiracy to Violate the Equal Protection Clause of the Fourteenth Amendment (Redux)

In Ricci, the court stated in an instance of conflict between disparate impact and disparate treatment permissible justifications for disparate treatment must be grounded in the strong basis for evidence standard. Once a process has been established and employers have made clear their selection criteria they may not then invalidate the test results thus upsetting an employee's legitimate expectation not to be judged on the basis of race. Doing so without a strong basis in evidence of an impermissible disparate impact amounts to the sort of racial preference that congress has disclaimed sec 2000€2(J). See also, Wygant v. Jackson Board of Education, 476 U.S. at 277. In Griggs v. Duke Power Company the court interpreted Title VII of the Civil Rights Act of 1964 to prohibit employment practices that have a racially disparate impact irrespective of whether they were adopted with a discriminatory purpose.

Plaintiff contends that unlike the circumstances espoused in Ricci, plaintiff's claim is supported by a strong basis in evidence of an impermissible disparate impact upon the targeted minority groups. Plaintiff has been profiled, stopped, searched and arrested in the past 3 years more than 10 times the amount the average white citizen is stopped searched and arrested in his lifetime. Plaintiff has provided statistics stating that one in three black men will see prison in their life time while only one and seventeen white men will see prison in their life time. Plaintiff has been incarcerated at the Las Vegas City Jail where 90% of his fellow inmates were of black and Latino heritage. "Even in the absence of specific and identified discrimination, nothing in our jurisprudence precludes the use of race neutral means to improve race and gender representation." Hayden v. County of Nassau. 180 F.3d 42, 51(2d Cir 1991).

The contention of disparate treatment of the plaintiff and other black and Latino persons who fit the favored profile are directly supported under the basis in evidence standard by the discriminatory reality of the over representation of blacks and Latinos serving time within our prison systems. Supported by a strong basis in evidence clear violations of the Equal Protection Clause of the Fourteenth Amendment through the discriminatory application of the Felony Component of the Thirteenth Amendment, were carried out against the plaintiff and people of color, in general, nationwide. Certain laws and police practices may seem reasonable and fair upon the surface but when they are applied in a discriminatory manner and for a discriminatory purpose they result in having a disparate impact upon targeted minority groups.

### Commerce Clause

The late President Kennedy called for Civil rights legislation in a message to congress to which he attached a proposed bill. Its stated purpose was "To promote the general welfare by eliminating discrimination based on race, color, religion or national origin in … public accommodations through the exercise by congress of the powers conferred upon it… to enforce the provisions of the Fourteenth and

21

Fifteenth amendments to regulate commerce among the several states, and to make laws necessary and proper to execute the Powers conferred upon it by the Constitution." H.R. Doc. No 124, 88[th] Cong., 1[st] Sess., Oct 14.

Title II of the Civil Rights Act of 1964 is a valid exercise of congress' Power under the Commerce Clause as applied to a place of public accommodation serving interstate travelers. Civil Rights Cases 109 U.S. 3. The interstate movement of persons is commerce which concerns more than one state. Heart of Atlanta Motel Inc. v. United States 379 U.S 241 (1964).

Plaintiff was threatened with arrest by a Henderson Police Officer if plaintiff ever returned to the Calico Ridge neighborhood. Plaintiff was threatened with arrest by Officer Scoble for being on private property which plaintiff had contracted for the right of possession from the owner. Officer Scoble stated to plaintiff that "the city of Henderson wants plaintiff off of the property. Plaintiff was also threatened with arrest by a Henderson Police officer for being on the property and was forced to gather his belongings and leave the property.

Section 201(2) declares that "discrimination or segregation" is supported by state action when carried on under color of any law, statute, ordinance, regulation or any custom or usage required or enforced by officials of the state or any of its subdivisions. Id. In addition Section 202 affirmatively declares that all persons "shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a state or any agency or political subdivision thereof. Id.

In Gibbons v. Ogden the court proclaimed "the power to regulate; that is, to proscribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercise to its utmost extent, and acknowledges no limitations, other than are proscribed in the Constitution." 22 U.S 1 (1824). The protection of interstate commerce is within the regulatory power of Congress under the Commerce Clause whether or not the transportation of persons between states is commercial. Heart of Atlanta. Id Also, in Gibbons, the court explained that congress could regulate both interstate commerce and activities within a state as part of its national police power to outlaw moral wrongs. Id,

Congress' action in removing the disruptive effect which it found racial discrimination has on interstate travel is not invalidated because congress was also legislating against what it considered moral wrongs. Heart of Atlanta. Id. Plaintiff contends that individual or even communal racial discrimination has a disruptive effect upon interstate commerce. In short, no one wants to travel to be where they are not wanted no matter what color their skin. Plaintiff's facts differ from that of Heart of Atlanta in that not individuals but the very city itself has institutionalized racial profiling and discrimination thru the city government, police department, judicial and prison systems and such systemic racial discrimination has a much more profound disruptive effect upon interstate commerce and cuts much more at the heart of a growing and burgeoning city.

See also United States v. Wrightwood Dairy Co. 315 U.S. 110 (1942). See also, Wickard v. Filburn, where the court noted "But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier

22

time have been defined as 'direct' or 'indirect'." 317 U.S. 111 (1942). See also United States v. Darby Lumber Co, 312 U.S. 100 (1941), where the court held that the U.S. Congress had the Power under the Commerce Clause to regulate employment conditions.

Congress had power to enact appropriate legislation with regard to a place of public accommodation such as appellant's motel even if it is assumed to be of purely "local" character as congress' power over interstate commerce extends to the regulation of local  incidents thereof which might have substantial and harmful effect upon that commerce. Heart of Atlanta. Id

201 (c)(4) and the establishments listed in class four affect commerce if they are within, or include within their own premises, an establishment "the operations of which affect commerce" Heart of Atlanta Id.

Finally, 6c 203 prohibits the withholding or denial of any right etc., of any right or privilege secured. Section 2d and 202 or the intimidation, threatening or coercion of any person with the purpose of interfering with any such right or the punishing, etc., of any person for exercising or attempting to exercise any such right. Id. While on Officer Scoble's third invasion of the property he stated to plaintiff that if he wished he could at that moment arrest the plaintiff for camping but that would be a little extreme so he was going to issue a camping citation instead. A certain level of intimidation is inherent within the title and presence of any police officer. They all carry guns openly and have the authority to take you to jail. An ordered society requires the visible presence of an overwhelming counter force to deter criminal activity. However, when a police officer uses this overwhelming presence to subjugate ordinary citizens under a discriminatory will he has broken the trust of the office and must be numbered amongst the criminal element.

Plaintiff asserts that the listed discriminatory predicate acts perpetrated against the plaintiff by agents acting under the color of law within a grand, national conspiracy to profile and segregate black and Latino citizens runs against the mandates of the Civil Rights Act of 1964 and effectuates and undue burden upon interstate commerce.

**"Confident with your help man will be what he was born to be; free and independent."**

*President John F Kennedy*


"No woman, no cry"

Bob Marley

Keleif Browden was arrested and jailed in Rikers Island at the age of 16 for allegedly stealing a back pack. He spent 3 years being raped and tortured. His misery was designed by individuals working within the New York Department of Corrections. He was never charged with a crime. After his release he committed suicide. Who pays for his lost soul?

My ears bleed from the weeping of the Daughters of Zion for their lost children. Generation after generation. The time has come for a change.

"Three the Hard Way"

Jim Brown (Cleveland Browns)

**Congressional Enforcement Power of the Thirteenth Amendment.**

The United States Constitution provides Congress with specified powers of enforcement. The facts at present reveal three avenues through which congress is afforded to take enforcement action. Section 2, of the Thirteenth Amendment gives congress the authority to enforce the Power of the Amendment. In Jones v. Alfred H. Mayer Co., the court declared; Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation .[...] this Court recognized long ago that, whatever else they may have encompassed, the badges and incidents of slavery-its "burdens and disabilities"- included restraints upon "those fundamental rights which are the essence of civil freedom, namely, the same right...to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens. Civil Rights Cases, 109, U.S. 3, 109, U.S. 22.

Section 2, of the Thirteenth Amendment gives congress the Power to eradicate all badges and vestiges of slavery throughout our nation. This nationwide conspiratorial racket seeks to return the descendants of freed slaves back to slavery and stands as a badge and a vestige of the outlawed institution. Congress has the duty to legislate to eliminate this modern day badge of slavery. In the Civil Rights Cases the Court declared; "This amendment, as well as the Fourteenth, is undoubtedly self-executing, without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances. By its own unaided force and effect, it abolished slavery and established universal freedom. Still legislation may be necessary and proper to meet all the various cases and circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit. And such legislation may be primary and direct in its character, for the amendment is not a mere prohibition of state laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." Civil Rights Cases, U.S. 3(1883).

The amendment has a "reflex character also, establishing and decreeing universal civil and political freedom throughout the United States." And thus congress was empowered "to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States. Civil Rights Cases. Id

**Congressional Enforcement Power of the Fourteenth Amendment.**

Section 5, of the Fourteenth Amendment, the Enforcement Clause, provides congress with the Power to Enforce certain fundamental rights and protections guaranteed by the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. Section 5 of the Fourteenth Amendment, which permits congress to enforce by appropriate legislation the constitutional guarantee that no State shall deprive any person of Life, Liberty or Property without the due process or deny any person equal protection of the laws, City of Boerne v. Flores, 521 U.S. 507, 517.

Plaintiff has shown that this illegal nationwide conspiratorial racket employs methods which are in violation of the Fourth Amendment protections against unwarranted searches and seizures through the use of illegal pretexts. The Fourth Amendment protections are guaranteed to all citizens through the due process clause of the Fourteenth Amendment. Also equal application of the laws are guaranteed

24

through the equal protection clause of the Fourteenth Amendment. Congress has a duty to legislate to Enforce the Power of the Amendment.

### Congressional Enforcement Power of the Commerce Clause.

Finally, the express language of the Constitution provides congress with the Power to legislate in order to safeguard the interests of Interstate Commerce. In Heart of Atlanta, the court announced that Title II of the Civil Rights Act of 1964 is a valid exercise of congress' Power under the Commerce Clause as applied to a place of public accommodations. Id. Also Congress' action in removing the disruptive effect of racial discrimination on interstate commerce is not invalidated because congress was also legislating against what it considered moral wrongs. Id.

It is clear that this illegal nationwide criminal conspiracy to incarcerate black people and people of color in general for profit creates an undue burden upon interstate commerce and interstate travel by the targeted minority groups. Congress has the duty to legislate to illuminate this undue burden upon interstate commerce.

### "Radioactive"

### Imagine Dragons

This nationwide discriminatory conspiracy has contaminated the official workings of the local, city, county and state governments all across our nation. The solution lies within the discriminatory application of the conspiracy. Since they have chosen to combine their efforts in secrecy they must be separated and brought into the light. The cohesive nature of their methods between departments must be shattered into small bits and pieces.

Congressional oversight of individual governmental departments within the cities, counties and states of our nation is in order. Methods of operation and individual police actions must be placed under the watchful eye of a mandated congressional review board. Uniform methods of operation must be established throughout the nation. Surveillance technology must be incorporated to insure transparency of police actions toward individuals. Affirmative Action hiring protocols must be established and dutifully enforced within all the previously listed departments. Universal limits must be placed upon bail amounts for misdemeanor offenses. Also every penny of revenue collected from local, city, county and state governments must be accounted for.

We do not seek to federalize the entire workings of the city and state governments. Only the major parts of them. Using the Constitution to override the Constitution. If it weren't so ingenious it would almost be humorous. Let's try a Sarah Palin like; "How's that state sovereignty thing workin for ya?" now that funny. Say hello to your local, federal police department, the daughters of Zion shall weep for their children no more. Welcome to the new age sister-girl, it's a beautiful thing.

"How long? Not long. Because no lie can live forever."

Dr. Martin Luther King Jr.

25

<u>Violations of 18 U.S. Code 1581 Peonage; Obstructing Enforcement</u>

(a) Whoever holds or returns any person to a condition of peonage, or arrest anyone with the
intention of placing him in or returning him to a condition of peonage, shall be fined under this
title or imprisoned not more than 20 years or both. If death results from a violation of this
section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse
or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be
fined under this title or imprisoned for any term of years, or life, or both.

(b) Whoever obstructs, or attempts to obstruct, or in any way interferes with or prevents the
enforcement of this section, shall be liable to penalties proscribed in subsection (a).

In Bailey v. Alabama, 219 U.S. 219, 241 (1910), the Supreme court concluded "the plain intention of
the amendment was to abolish slavery of whatever name and form and all its badges and incidents; to
render impossible any state of bondage; to make labor free; by prohibiting that control by which the
personal service of one man is disposed of or coerced for another's benefit, which is the essence of
involuntary servitude. While the Amendment was self-executing, so far as its terms were applicable to
any existing condition, Congress was authorized to secure its complete enforcement by appropriate
legislation.

In United States v. Clyatt, 197 U.S. 207, 25 S.Ct. 429. 49 L.Ed. 726 (1905),where a custom or practice
of those employers of labor in the turpentine business searched out and captured laborers who were in
debt to employers, returning them to forced labor in-order to pay the debt. The court stated; the
condition of peonage is a condition of enforced servitude by which the servitor is restrained of his
liberty and compelled to labor in liquidation of some debt or obligation, real or pretended, against his
will; and any agreement giving another the right to exact such servitude is invalid in law, is treated as
made involuntary, and affords the creditor or master no protection; and in considering the effect of
influence, threats or force in rendering service involuntary and creating the "condition" in question we
may take into consideration in each case the relative inferiority of the person so contracting to perform
the service when compared with the person exercising the force.

Also, that if a person hires another under, or induces him to sign, a contract, by which the latter
agrees during the term to be imprisoned or kept under guard, and, under cover of such agreement,
afterwards holds the party to the performance thereof, by threats, punishment or undue influence,
subduing his free will when he desires to abandon such service, he is guilty of holding such person in a
condition of peonage. Id.

Plaintiff asserts that local governments, cities and states have developed a scheme of institutionalized
peonage. Legislation is passed producing excessive bail amounts for minor offenses. The police then use
illegal pretexts to stop and search profiled individuals always scheming to find more then the pretext
affords. If nothing is found then excessive bail citations are issued. The profiled victim, then faced with
jail time, is forced to agree to pay the excessive bail amount or a lesser fixed amount. If victim cannot
pay then he is sent to prison where the city is recompensed by the federal government.  There are
simply no loose ends to this racket.

W. E. B. Du Bois, stated that slavery was not abolished even after the Thirteenth Amendment. There
were four million freedmen and most of them on the same plantation, doing the same work they did
before emancipation, except as their work had been interrupted and changed by the upheaval of war.

26

Moreover, they were getting about the same wages and apparently were going to be subject to slave codes modified only in name. Du Bois, Black Reconstruction. (1935). P. 188.

As plaintiff has stated before, the pattern or practice of profiling is the modern day indoctrination of the former slave codes modified only in name. In all listed counters with police from the listed cities, plaintiff's constitutional rights were violated because of his heritage. Plaintiff was incarcerated and returned to a condition of peonage until the full bail amount was satisfied. The very structure of this nationwide conspiracy is rooted in the slave codes of reconstruction. The discriminatory and conspiratorial actions taken against the plaintiff are in clear violation of Code 1581.

### Violations of Title 18 USC section 242

To sustain a conviction for deprivation of rights under color of law under 18 U.S.C Section 242 (and by extension conspiracy to deprive rights under 18 U.S.C. Section 241) the government must show that a constitutional violation has occurred. Section 242 incorporates constitutional law by reference. United States v. Lanier, 520 U.S. 259, 265 (1997).  Liability can only be imposed where in light of the preexisting law the unlawfulness [under the constitution is] apparent. Lanier, 520 U.S. at 271-72 (quoting Anderson v. Breighton).

The court stated that willful conduct taken by officers with the specific intent to violate rights made specific by provisions of the Constitution or decisions of the courts interpreting them will support a conviction under 242. U.S. v. Parker, 165 F. Supp. 2d 431, 441 (W.D.N.Y. 2001).  Also, in Sease, Purely illegal activities by law enforcement constitute a constitutional violation. Id.

As previously noted the plaintiff was stopped and searched in Las Vegas under the pretext of plaintiff illegally walking in the street. Plaintiff was searched and arrested by Marshals in Las Vegas under the pretext of plaintiff being in a park unattended by a child. In the city of Henderson, Plaintiff was stopped searched and had his identification run for priors and outstanding warrants by the Henderson Police under the pretext of plaintiff walking on the sidewalk. Shortly thereafter, plaintiff was arrested on an outstanding warrant and taken to the Las Vegas city jail. Plaintiff was stopped, searched and had his Identification ran for priors and outstanding warrants by the Henderson police under the pretext of plaintiff walking too close to the library when it was closed.

In Los Angeles, Plaintiff was stopped, handcuffed and placed into the back seat of a police vehicle while plaintiff's car was searched and plaintiff's Identification was checked for priors and outstanding warrants under the pretext of plaintiff driving with his lights off while plaintiff was waiting in the drive thru lane at a Jack in the Box. While in Los Angeles Plaintiff was stopped at gun point and had his identification ran for priors and outstanding warrants under the pretext of not coming to a complete stop at a stop sign. Plaintiff could continue but who has the time?

In Whren v. United States, the police officers had improper motives in the sense that the officers conducted a stop for the purpose of investigating drug offenses for which they did not have probable cause or reasonable suspicion, using traffic offenses for which they did have probable cause as a pretext. 517 U.S. 810-12.  In United States v. Bradfield, where a series of raids of crack houses. During the course of the raids officers would take a portion of the money, drugs and guns for themselves, while reporting the rest for forfeiture. 225 F. 3d 66o. 2000 WL 1033022 (6th Cir July 18 2000)

In United States v. Parker, three Buffalo Police Officers along with a DEA agent entered into an agreement with a known drug trafficker to arrange a meeting with a more prominent Jamaican drug dealer. Id. The plan was for the officers to rob the drug dealer's safe house and divide the proceeds of the robbery between themselves. In United States v. Contreras 134 F. Supp. 2d 820, 823 (S.D. Tex 2000), Contreras did not arrest the victim because he had probable cause to believe she was an illegal alien he arrested her so that he could rape her.

Also, accordingly, although for the purposes of the exclusionary rule the subjective intent of the officer is irrelevant in the context of a 242 prosecution, the courts may inquire whether the officer acted with a corrupt, personal and pecuniary purpose. Sease, Id. In addition, unlike in the exclusionary rule context the court must already inquire into the subjective intent of the officer because willfulness is already an element of an offense under 18 U.S.C. 242. Sease, Id.

In Sease, the court explained that it is required that the government show that defendant had the specific intent to deprive the victim of a right under the constitution. Id. Also in Screws v United States, 325 U.S. 91, 104-105 (1945), the specific intent required by the act is an intent to deprive a person of a right which has been made specific by decisions interpreting the constitution. Must be determined by objective criteria not subjective intentions under 4th Amendment but objective intent under the Equal Protection Clause.

Plaintiff has provided multiple incidents of discriminatory extortive violations of plaintiff's Fourth Amendment Rights guaranteed by the Fourteenth Amendment Due Process Clause and multiple violations of plaintiff's rights to equitable application of the law guaranteed by the Fourteenth Amendment Equal Protection Clause. Plaintiff contends that these discriminatory extortive predicate acts against the plaintiff reveal a pattern or practice of local racketeering activities by the mentioned police departments as part of a much larger nationwide racketeering conspiracy to incarcerate black people and people of color in return for federal compensation from the national prison directive. Plaintiff contends that the illegal predicate acts enforced against him were not only willfully done by the participating police officers but the acts are the result of systemic training and coordination in the use of pretexts to justify the illegal stops, searches and seizures against the plaintiff, from within the mentioned police departments.

Plaintiff contends that the various illegal incidents of pretextual stops, searches and arrests amount to the deprivation of plaintiff's constitutional rights and reveal a pattern or practice of systemic corruption from within the named city legeslatures, police departments, judiciaries and prison systems. Plaintiff also contends that these illegal corrupt predicate acts are the product of a national profiling conspiracy motivated by the governmental pecuniary reimbursement for the incarceration of black people and people of color in general. Therefore plaintiff contends that the listed predicate acts against the plaintiff are in violation of Section 242.

### Violations of Title 18 USC section 241

The wording of Section 241 suggests no limitation of its coverage to exclude Fourteenth Amendment Rights. The language of 241 is plain and unlimited... Its language embraces all of the rights and privileges secured to citizens by all of the Constitution and all of the laws of the United States. Id. The legislative history supports the view that it was intended to encompass Fourteenth Amendment Rights within its protections. Id. We have no doubt of "The Power of Congress to enforce by appropriate criminal

sanction every Right guaranteed by the Due Process Clause of the Fourteenth Amendment. United States v. Williams 341 U.S. 70, 341 U.S 72. [Footnote 2].

Plaintiff was threatened with arrest by the Henderson Police department if he ever returned to the Calico Ridge residential area. Plaintiff was threatened with arrest by officer Scoble of the Henderson Police Department for being on private property which plaintiff had contracted for the right of possession from the owner. Plaintiff was evicted from Lake Las Vegas by the maintenance manager for reading the Bible in a secluded area. Plaintiff was forced to leave the property under the threat of arrest by a Henderson Police Officer. Plaintiff was stopped, searched and detained at the McCaaran Airport for walking to the bus stop.

The allegations concerning the arrest of negroes by means of false reports was sufficiently broad to cover a charge of active connivance by state agents or other official discriminatory conduct constituting a denial of rights protected by the Equal Protection Clause. Id 383 U.S. 756-757. To act under color of law does not require that the accused be an officer of the state. It is enough that he is a willful participant in joint activity with the state or its agents. Id 383 U.S. 794-795.

Plaintiff contends that these illegal discriminatory predicate acts levied against the plaintiff by the listed police departments reveal a pattern or practice of a discriminatory willful conspiracy rooted in the pecuniary interests of the previously listed city governments. As construed to protect Fourteenth Amendment Rights Section 241 is not unconstitutionally vague, since by virtue of its being a conspiracy statute it operates only against an offender acting with specific intent to infringe the right in question Screws v. United States, 325 U.S. 91. The states' involvement need be neither exclusive nor direct in order to create rights under the Equal Protection Clause. Id P. 383 U.S. 756-757.

Plaintiff has provided the Court with direct evidence of three different city police departments involved in multiple incidents of multiple violations of plaintiff's Fourth Amendment Rights against unwarranted searches and seizures guaranteed by the Fourteenth Amendment Due Process Clause. Plaintiff has also provided the Court with direct evidence of three different city police departments involved in violations against plaintiff's rights of Equal Protection under the law guaranteed through the Fourteenth Amendment. Plaintiff has also provided direct evidence of police violations of plaintiff's constitutional right to travel, privacy and liberty. Section 241 includes within its coverage Fourteenth Amendment rights whether arising under the Equal Protection Clause, as in this case or under the Due Process Clause as in United States v. Guest. United States v. Price, 383 U.S. 787 p383 U.S. 753.

These predicate incidents of violations of plaintiff's Fundamental rights afforded by the United States Constitution through the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment reveal a pattern of willful discriminatory intent by the city and its agents. Section 241 reaches conspiracies specifically directed against the exercise of the constitutional right to Travel freely from state to state and to use highways and other instrumentalities for that purpose. Id Pp.383 U.S. 757-760. And the right to equal use of public facilities described in the indictment has been made definite by decisions of this court. Id, Pp 383 U.S. 753-754.

29

Travelling in a straight line through a curved universe...........surfing.

*The Silver Surfer*

### Violations of Title 18 U.S.C Section 1983

Elements: 1. A person subjected plaintiff to conduct that occurred under color of state law

2. Conduct deprived plaintiff of Constitutional rights

In Will v. Michigan Department of State Police, the Court noted that a state is not a person under Section 1983, but a city is a person under the law. 491 U.S. 58, 109 S. Ct 2304, 105 L. Ed 2d 45 [1989]. The Supreme Court has broadly construed the provision "under color of any statute" to include virtually any state action including the exercise of power of one "possessed by virtue of state law and made possible only because the wrong doer is clothed with the authority of state law. United States v. Classic, 313 U.S. 299, 61 S. Ct 1031, 85 L. Ed 1368[1941]. Thus the wrongdoer's employment by the government may indicate state action. Id "Misuse of power, possessed by the virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law is action taken under 'color of state law" Monroe Id. See also Monell v. Department of social Services of the City of New York, 436 U.S. 658 (1978), which held that local governments could face liability in federal court for violating individuals' constitutional rights if the official committed the violation pursuant to a policy or custom of the local government.

Plaintiff contends that he has cited multiple incidents of police violations of his Fourth Amendment right against unwarranted searches and seizures and certain Fundamental Rights noted in the Bill of Rights guaranteed through the Fourteenth Amendment Due Process Clause. Violations of his Fourteenth Amendment Equal Protections and violations of his Civil Rights guaranteed thru the Fourteenth Amendment and the Express Power of congress contained within the Commerce Clause of the United States Constitution. The focus is on "the right" [not] at its most general or abstract level but at the level of its application to the specific conduct being challenged. Wiley v. Doory, 14 F.3d 993, 995 (4th Cir 1994). See also Knussman, 272 F.3d at 638.

Plaintiff asserts that at least certain Henderson police officers, under the direction and control of the city of Henderson acted under the authority of the laws of the state of Nevada. Plaintiff also asserts that his constitutional rights were violated by the Las Vegas Police acting under the authority of the laws of the state of Nevada and by the Los Angeles police acting under the authority of the laws of the state of California. Plaintiff contends that the discriminatory predicate acts committed by members of all three police departments against the plaintiff's rights guaranteed by the constitution are part of a nationwide racketeering conspiracy for cities across this country to recieve government compensation for the willful and illegal incarceration of black people and people of color in general.

In Holmes v. City of Atlanta 350 U.S. 157 the court expounded "The refusing to allow plaintiffs and others similarly situated because they are negroes to make use, on a substantially equal basis with white citizens, of municipal facilities for playing golf is to practice a forbidden discrimination. Plaintiff's facts differ from Holmes in that they are a much more egregious form of discrimination. Plaintiff is not being denied the right to play a sport on municipal property by some local discriminatory custom. Plaintiff has been denied the Fundamental liberty interest within his person on multiple occasions. Plaintiff has been denied the fundamental right of Privacy upon private property on multiple occasions. Plaintiff is also

30

being denied his right to contract for labor on private property by city officials carrying out a systemic discriminatory policy.

In Wolfe v. Colorado the Court noted that the security of one's privacy against arbitrary intrusion by the police... is basic to a free society. 338 U.S. 25, 338 U.S. 27. In Monroe, a violation of 1983 was determined when thirteen Chicago Police entered a home with no search warrant and no arrest warrant, ransacked the home, made the family stand naked in living room, took the father down to the station and questioned him about a murder then later released him without a criminal charge.

Plaintiff has previously noted several predicate acts violating plaintiff's fundamental rights carried out by police acting under the authority of state law. These predicate acts were done with the spirit of discrimination in order to further a nationwide conspiratorial racket. Plaintiff asserts that the predicate acts done against him were in violation of Title 18 U.S.C Section 1983. In Monroe, the dissent considers that the "under color of", provision of 1983 distinguishes between unconstitutional actions taken without state authority, which only the state should remedy and unconstitutional actions authorized by the state, which the federal act was to reach. Id.

Within this country we have a multitude of ethnicities, races and national origins. We tread upon a tidal wave of diversity. Yet through all of our differences the law is ordered to be applied to everyone equally. This is what makes us great. This is what makes us better than any other country in the history of the world. In order to maintain our status we must labor to remain true to this ideal.

The question is not whether a majority of the people in a majority of the states are likely to be attached to and able to secure their own liberties. The question is not whether the majority of people in every state are not likely to desire to secure their own rights. It is whether the majority of people in every state are sure to be so attached to the principles of civil freedom and civil justice as to be as much desirous of preserving the liberties of others as their own as to insure that under no temptation of party spirit, under no political excitement, under no jealousy of race or caste, will the majority, either in numbers or strength, in any state seek to deprive the remainder of the population of their civil rights. Id

### Violations of 18 U.S.C. 1343 (Wire Fraud Statute) and Honest Services Fraud

They gather themselves together, they hide themselves, they mark my steps, when they wait on my soul.   Psalm 56:6

Plaintiff asserts that a nationwide conspiracy to incarcerate black people and people of color in general in return for government compensation has been in operation for over the past forty years. Plaintiff has provided data stating that one out of three black men will spend time in prison as opposed to one out of seventeen white men. Blacks are four times more likely than whites to be arrested for marijuana possession. Plaintiff has provided the court evidence of plaintiff's multiple encounters with police and how they appear suddenly from out of nowhere. In Virginia in a certain county the jails are at 280% capacity. These statistics and examples create the inference that the police have become extremely efficient in their job practices. Almost to the point where they know what an individual has been doing and where he is going before they even stop him. Like they have eyes in the back of their heads.

31

"Eyes Without A Face"

Billy Idol

Plaintiff was stopped while walking upon the sidewalk by the Henderson Police. The policeman knew plaintiff had an outstanding warrant but he had to wait for plaintiff to leave the property before he could stop him upon a pretext to justify running plaintiff's identification so that he could verify the outstanding warrant and arrest him. The question is; how did the officer know exactly when plaintiff had left the property? This particular incident creates the inference that someone other than the police was watching the plaintiff's movements for the police.

"You want to go to jail or do you want to go home?"

Denzel Washington (Training Day).

There is a scene in the movie "Training Day" for which I do believe Mr. Washington received an Academy Award for Best Actor. Alonzo and the trainee are in a wooded area watching a drug buy take place. Alonzo gives the drug dealer a signal with his head lights and tells the trainee that he allows the drug dealer to sell drugs and the drug dealer provides him with information about the drug buyers. The real thing is kind of like that but much more sophisticated.

In the early 80s within a certain neighborhood there lived a drug dealer who served from out of his home or on the corner it doesn't matter. The police had eyes watching the drug house. Drug buyer parked his car and went to the drug house to get served. Five minutes later the drug buyer exited the drug house got in his car and hit the road.  The eyes on the drug house used the house phone to communicate to the police the description of the drug buyer and a description of his car. Soon after, the police searched for the car on the highway then used a pretextual reason for stopping and searching the car for the marijuana the drug buyer had just purchased five minutes before.

In the 90s with the advent of cell phone technology the eyes were no longer stationed and could walk up and down the street and drive on the road ways. Same scenario but now the eyes can call or text the police from his cell phone to a policeman's private cell phone while tracking the drug buyer driving on the highway. The eyes can send an e-mail if they so choose. In the 2000s the police now have access to the Global Positioning System. They can monitor an individual's cell phone and automobile from the time he leaves his home, to the drug buy, and his exact positioning after the drug buy.

Plaintiff asserts that through the use of paid informants, some of them drug dealers, the police have escalated this discriminatory conspiracy. They pay people to watch black people do dirt then knowing they have the dirt on them they go about searching for them in order to incarcerate them. The police have access to GPS technology in partnership with the local prison bureau. The very same GPS technology that the local prison bureau uses to track those bracelets placed upon convicted individuals who are sentenced to home confinement is also being used by local police all across this country to track the cell phones and automobiles of ordinary black and Latino citizens. This technology is being used in a discriminatory manner for a discriminatory purpose and only sheds more light into the interrelationships of people and departments within this broad conspiratorial racket. This similar practice within the cities also reveals a common source within the overall nationwide illegal discriminatory conspiracy.

32

"41 Shots"

Bruce Springsteen (The Boss).

We need to know who they have been following and exactly when they were followed. If it is found that an individual serving time for drug possession was tracked before he was arrested than that individual must be released. If he was busted for weed then a mandatory drug rehab class. If it is found that an individual was shot and killed and that individual was being tracked by the police before he was shot and that incident was deemed "gang related" so that no one had to investigate the incident; this would not be good for the country.

Wire fraud is identical to the mail fraud statute except that it speaks of communications transmitted by wire. See also United States v. Profit, 49 F.3d 404, 406 n.1 (8th Cir.) (The four essential elements of the crime of wire fraud are: (1) that the defendant voluntarily or intentionally devised or participated in a scheme to defraud another out of money; (2) defendant did so with the intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used: (4) and that interstate wire communications were in fact used. Citing Manual of Model Criminal Jury Instructions for the District Courts of the Eighth circuit 6.18.1341 (West 1994) Cert Denied, 115 S.Ct. 2289 (1995);

See also United States v. Hanson, 41 F.3d 580, 583 (10th Cir. 1994) Two elements comprise the crime of wire fraud: (1) a scheme or artifice to defraud; and (2) use of interstate wire communication to facilitate that scheme; see also United States v. Faulkner 17 F.3d 745, 771 (5th Cir 1994) (essential elements of wire fraud are (1) a scheme to defraud and (2) the use of, or causing the use of interstate wire communications to execute the scheme), cert denied, 115 S.Ct 193 (1993). See also United States v. Cassiere, 4 F.3d 1006 (1st Cir, 1993) (to prove wire fraud government must show (1) scheme to defraud by means of false pretenses, (2)Defendant's knowing and willful participation in scheme with intent to defraud and (3)use of interstate wire communications in furtherance of scheme); see also United States v. Maxwell, 920 F.2d 1028,1035 (D.C. Cir. 1990) (wire fraud requires proof of (1) a scheme to defraud; and (2) the use of an interstate wire communication to further the scheme.)

Plaintiff asserts that the communications between private civilians and local police agents to further a discriminatory conspiracy is fraudulent in nature. Plaintiff also asserts that the source of this conspiracy is Federal in nature and that at some point and at some time from some state these fraudulent communications passed over state lines. Plaintiff drove from New Jersey to Nevada crossing over several state lines. Plaintiff contends that he is the target of a discriminatory nationwide conspiracy and his whereabouts were monitored and communicated across state lines during his cross country drive..

Plaintiff also asserts that unless a communications satellite is physically located directly above a particular state, cell phone calls from private individuals to police and visa versa at some point in time bounced off a satellite, the digital information passing over state lines and down to a cell tower. Finally, plaintiff asserts that targeting information, relayed from a Global Positioning Satellite, crossed over state lines on its way down to his targeted vehicle or his cell phone. These facts satisfy the interstate communications element of the Wire Fraud Statute.

33

"By Any Means Necessary"

Malcom X

All incoming and outgoing communications from every city, county and state police department within this country must be traced. Phone calls, e-mails, text messages, every form of communication which can be traced must be traced. We will find a sequence and must follow that sequence to where it leads.

All incoming and outgoing communications regarding the plaintiff either by name, location, social security number or New Jersey State Identification number must be traced. All of Plaintiff's whereabouts at least over the past three years while residing in Nevada must be traced using plaintiff's cell phone GPS application. Once plaintiff's locations have been confirmed then everyone in physical proximity with the plaintiff must have their recent communications traced.

Plaintiff does the same thing every day he walks to the same locations using the same routes every day. Anyone driving by the plaintiff, anyone walking by the plaintiff, anyone at the shower stop, convenience stores, super markets, libraries, the dinner place, the house, anywhere plaintiff goes, those individuals within his surrounding environment must have their communications traced. Also be sure to check plaintiffs Gibson library identification number and trace his computer usage to see if anyone is tampering with his terminal possibly creating another avenue of interstate wire fraud through internet hardware devices.

This is the fastest and most efficient way to find the source of this discriminatory conspiracy. Plaintiff also drove from New Jersey to Nevada. GPS plaintiff's vehicle or his cellphone and trace the communications of any cars which drove near him or in sight of him and any rest stops, malls, restaurants, etc, etc. In this instance we shall also find that wire communications supporting this discriminatory conspiracy crossed over state lines.

The court interpreted the statute to only cover "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who has not been deceived. Skilling v. United States 130 S.Ct. 2896. Plaintiff has provided the court with revenue data from private prison corporations which numbers in the billions. Plaintiff also asserts that the driving force behind all revenues from all prisons in this nation is having black bodies in prison beds.

Plaintiff contends that police, city councilmen, employees of the local and state judiciaries and certain prison employees are not only involved in this discriminatory and illegal conspiracy out of hate but receive unreported financial compensation from unreported sources for their efforts in filling the jails with black people and people of color in general. In other words, they are receiving kickbacks and payoffs. Therefore the financial records and dealings of the aforementioned local, city and state employees must be reviewed. Not only their individual financial records but the financial records and dealings of close family members, ex-spouses, childhood friends and anyone else who may be suspected of keeping or holding the illegal gains of public authorities.

Because transparency is undermined whenever a public official engages in a secret scheme motivated by private gain rather than public interest-whether or not the scheme also causes tangible injury to the public –official loyalty is an end in and of itself. Correspondingly, betrayal of this loyalty is actionable under 1346. de Vegter, 198 F.3d at 1328-29. Also in Lemire, 720 F.2d at 1337 N.13, the court noted;

34

public officials are held to a higher standard of public trust than their private counter parts, and conflicts of interest may harm the public merely by giving the illusion of unfairness.

Also, plaintiff has provided data that blacks are four times likely to be arrested for marijuana possession. This fact alone creates the inference that black people are being singled out to be monitored purchasing marijuana. This creates the inference that drug dealers work in partnership with the police department which creates the inference that there is a whole bunch of marijuana and other drugs missing and unaccounted for from the evidence rooms of police departments all over this country and winding up in the hands of drug dealers for sale. Which creates the inference of kickbacks to police departments all over this country. You destroyed it?  We need more concrete verification then a signature that the product was destroyed.

In Mcnally v. United States, the Supreme Court noted that the mail fraud and wire fraud statutes pertained strictly to schemes to defraud victims of tangible property. In 1988, congress enacted a new law that specifically criminalized schemes to defraud victims of the intangible right to honest services. 483 U.S. 350 (1987). Also in United States v. Brumley, 116 F.3d 728 (5th Cir 1997). In order for a state official to have committed Honest Services Fraud they must have violated the state statute defining the services that which they owed their employer (the state). Also, under the most natural reading of the statute a federal prosecutor must prove that conduct of a state official breached a duty respecting the provision of services owed to the official's employer under state law. Stated directly, the official must act or fail to act contrary to the requirements of his job under state law. Id.

When plaintiff appeared in court to enter a plea of 'not guilty' for the camping citation plaintiff sat in the court room waiting to be called. While plaintiff was waiting the public defender represented three clients; two black males and one Latino male. Plaintiff took note that the public defender announced to the judge that in each instance his clients would plead "no contest" and agree to pay a decreased bail amount. In each instance the decreased bail amount was approximately 50% of the original bail amount.

In negotiations class we were taught to seek a target amount then to set a floor amount that one would not go below. Then we were taught to "high ball" the opening offer, so that we would have room to concede and lower the initial offer until we reach the target amount. Of course we were also taught to never make the opening offer. This "High Ball" negotiations strategy began with the Henderson City Legislature by creating excessively high bail amounts for offenses. $115 bail amount for a not walking on the sidewalk citation?

When the public defender tells his client that if he pleads no contest then he can get the bail amount cut in half, which in actuality is the city's target amount, he engages himself within a price fixing racket. Plaintiff received a camping citation with a $640 bail amount. Plaintiff was drawn into a discriminatory, highball negotiations racket the moment he received the citation and therefore has standing to challenge these methods

In United States v. Ashman 979 F.2d 469, 477 (7th Cir. 1992) the court held that a 'matching trade' scheme in which brokers traded buy and sell orders in equal quantity with cooperating local brokers by agreeing on the price of the trade, rather than bidding or offering the customers' orders on the open market and securing the best price available, constituted a deprivation of 'money and property under the terms of the mail and wire fraud statutes. The court explained that the traders, by determining customer prices themselves removed their customer's bids from the marketplace and forced customers

35

to accept inferior results, thus guaranteeing profits to the broker and denying the customers the opportunity to obtain better prices. The shifting of economic risk or opportunity to effect a person's financial position adversely deprives that person of money or property.

The public defender and the judge reflected a pattern or practice of collusive price fixing in this high ball strategy to the detriment of his clients. Such a strategy neither serves the public interest nor does it serve to educate and benefit the supposed wrong doers. This price fixing negotiation strategy only serves to enrich the city coffers. Robbing the city tax payers of the honest services of public office in which they justifiably rely.

In Clyatt, the judge also charged that a person who falsely pretends to another that he is accused of crime and offers to prevent conviction if he will pay a sum of money to satisfy the prosecutor, and thus induces the party to sign a contract to work out the amount, and to submit to restraint and deprivation of liberty while thus working out a debt, is guilty of holding such laborer in a condition of peonage, or causing him to be so held, whenever such laborer desires to leave his employment, but is compelled by threats or punishment to remain and work under such contract. Id

Also, when plaintiff was incarcerated in the Las Vegas City Jail plaintiff received three meals a day. There were constant complaints from plaintiff's cellmates that the County prison provided much better meals. With an eight dollar a day per diem with over 150 inmates within a cell block and four to five cell blocks included within the equation and feeding in a communal manner, leaves a lot of room for undercutting the individual per diem rate in order to illegally profit.

Also, when plaintiff was incarcerated at the Las Vegas City Jail the nurses took his blood pressure and discovered that it was excessively high. They prescribed blood pressure medicine for the plaintiff. This scenario also opens the door for mass fraud from federal compensation for prisoner medical expenses.

Everything is based upon ultimate compensation. It is similar, almost identical to the nationwide hospital emergency room profiling racket. When plaintiff lived in New Jersey, before relocating to Las Vegas, plaintiff had an accident. Plaintiff was taken to the Cooper Hospital Emergency room because plaintiff didn't have any medical insurance. Plaintiff received stiches and was released and went home. A week later plaintiff received a bill for thousands of dollars for surgery plaintiff never received. Cooper Hospital profiled the plaintiff knowing that plaintiff couldn't pay such a ridiculous bill. Cooper Hospital knew that ultimately the tax payers would compensate them for their fraud.

See United States v. Frost, 125 F.3d 346 (6th Cir. 1997),where the court noted that private individuals may commit fraud by breaching a fiduciary duty and thereby depriving the person or entity to which the duty is owed of the intangible right to honest services of that individual. See also, United States v. deVegter, 198 F.3d 1324 (11th Cir. 1999), where financial advisor hired by Fulton County was convicted of fraud when allegations showed a breach of fiduciary duty and an intent to defraud in such a manner that "reasonably foreseeable economic harm" to Fulton County was a consequence of the scheme.

See also United States v. Vinyard, 266 F.3d 320 (4th Cir 2001), where the court announced; "so long as the employee could have reasonably foreseen the risk to which he was exposing the employer, the requirements of 1346 will have been met. (reasonably foreseeable economic harm test). See also, United States v. Williams, 441 F.3d 716 (9th Cir. 2006). See also United States v. Gray, 96. F.3d 769 (5[th]

36

Cir. 1996), (materiality test) where the court stated; Materiality exists whenever an "employee has reason to believe the information would lead a reasonable employer to change its business conduct. See also, United States v. Pennington, 168 F.3d 1060 (8th Cir. 1999), where the court stated that proof of intent to harm may be inferred from the willful non-disclosure by a fiduciary' such as a corporate officer, of material information he has a duty to disclose.

The Prison racket operates under the same principle of ultimate compensation. Local legislatures enact exorbitant fines for petty misdemeanor offences. $640 for a camping ticket? If plaintiff had $640 he wouldn't be out in a 105 degree heat in the middle of the desert! If one is able to pay the fine then the city makes out big. If one is not able to pay the fine then that individual goes to jail and ultimately the tax payers reimburse the city.  Either way, ultimately the city will get compensated.

The structures of the hospital emergency room racket and the prison racket are so closely designed that they create the inference that they both evolved from the same source. Therefore, both nationwide rackets must be investigated nationwide in order to locate the source. Plaintiff is seeking the disgorgement of any and all illegal profits gained from all the listed examples over the past forty years or more.

### Violations of the Rico Statute

*No man can serve two masters: for either he will hate the one, and love the other; or else he will hold to the one, and despise the other. Ye cannot serve God and mammon.*          Matthew 6:24.

In order to prove a pattern of racketeering activity a plaintiff or prosecutor must show at least two racketeering predicates that are related and that amount to, or threaten the likelihood of, continued criminal activity. Proof of neither relationship nor continuity requires a showing that the racketeering predicates were committed in furtherance of multiple criminal schemes. HJ Inc. v. Northwestern Bell Telephone 492 U.S. 229 (1989). The United States Supreme Court has instructed Federal Courts to follow the continuity plus relationship test in order to determine whether the facts of a specific case give rise to an established pattern. Predicate acts are related if they "have the same or similar purpose, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. HJ Inc. Id.  Continuity is both a closed and open ended concept referring to either a closed period of conduct, or to past conduct that by its nature projects into the future with a threat of repetition Id. See also Boyle v. United States, 469 U.S. 241 (1985).

Plaintiff has provided multiple evidence of extortive predicate acts constituting the same or at least similar discriminatory pretextual violations against plaintiff for the discriminatory purpose of incarcerating black people in return for federal compensation by the Henderson, Las Vegas and Los Angeles Police Departments. These acts reveal a pattern or practice of racketeering activities over the course of many years. Plaintiff also contends that these racketeering activities are part of a nationwide systematic criminal conspiracy which has its source within Federal authority with tentacles reaching into state and local governments.  A racketeering conspiracy coordinated to continue indefinitely.

An enterprise requires structure such that it reflects three core features. "A purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprises' purpose. The court found that any enterprise by definition must have a purpose, and similarly that "association" among individuals implies both interpersonal relationships and a

37

common interest. With respect to the longevity prong the court found support in the pattern requirement of 1962(c) "so long as the substance of the relevant point is adequately expressed the court need not even use the word structure. Boyle, Id

Although an enterprise must have purpose, the court held that it may be carried out "on an ad hoc basis" and without a hierarchical decision making process. And while an enterprise requires an association among its members, those members need not have fixed roles. Different members may perform different roles at different times. Boyle, Id. Lastly, although longevity is required "nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." Also in Bridge v. Phoenix Bond & Indemnity Co. 583 U.S. (2008). Demonstrates the Supreme Courts reluctance to cabin the reach of RICO's broad statutory language; "In prior cases, we have rejected similar arguments in favor of the clear but expansive text of the statute." Relationship and continuity are two distinct requirements, though their proof will often overlap.

Plaintiff has presented multiple occurrences of similar, almost identical pretextual, discriminatory and extortive predicate acts in violation of plaintiff's Fourth Amendment, Due Process and Equal Protection rights, by the Henderson, Las Vegas and Los Angeles police departments. These predicate acts were committed with the intent to incarcerate plaintiff because plaintiff matched the profile of a black person. These predicate acts are part of a larger conspiracy which utilizes pretexts to stop blacks and Latinos in order to illegally search and seize them for the ultimate purpose of incarcerating them in return for federal compensation and amount to a pattern or practice of racketeering activity.

See Key West Police Department v. United States, where the department was declared a criminal enterprise where high ranking officers were convicted of running a protection racket for illegal cocaine smugglers. 837 F.2d 1509 (11th Cir. 1988.) See also Michael Milken v. United States, S.D.N.Y. 3 Fed. Sent. R. 159 (1990). 1990 WL 310497, where using a wide ranging network of contacts to manipulate stock and bond prices was declared a criminal enterprise. See also Michael Conahan v. United States, 307 Fed.3d 380, 386 (6th Cir 2002), where acts of mail fraud, wire fraud, tax evasion, money laundering and honest services fraud were declared to be a criminal enterprise. See also Rothstein v. United States, 735 F.2d 704. 84-1 USTC. P 9505, where a Ponzi scheme to finance philanthropy and lavish life style was declared a criminal enterprise.

Section 1961(5) states that at least two racketeering predicates committed within a ten year period are necessary to establish a RICO pattern, but implies that two acts may not be sufficient. Section 1961(5) thus assumes that there is something to a pattern beyond merely the number of predicates involved. In normal usage, the word pattern would also be taken to require not simply a multiplicity of predicates, but rather predicates arranged or ordered by reason of relationship that bear to each other or to some external organizing principle. [The text of RICO fails to identify the forms of relationship or external principles to be used to determine whether predicates fall into a pattern. RICO's legislative history however establishes that congress intended that to prove a "pattern of racketeering activity" a plaintiff or prosecutor must show both "relationship" and "continuity" that the racketeering predicates are related and they either constitute or threaten long term criminal activity. Id pp. 492].

Plaintiff asserts that the listed multiple predicate acts carried out against the plaintiff by the three listed police departments all occurred within the last ten years. Plaintiff contends that the extortive predicate acts were done in accordance with a discriminatory conspiracy within the Henderson city government which is tied to a national perspective. A nationwide discriminatory racketeering conspiracy

38

to receive federal compensation to incarcerate black people and people of color in general. This coordinated pattern or practice of predicate acts done under the color of law were not only carried out to fulfill a discriminatory purpose but they were indeed also motivated by pecuniary gain amounting to a racketeering enterprise.

## Violations of the Hobbs Act

In United States v. Garcia. 992 F.2d 409 (2d Cir 1993), the court stated: Although the McCormick Court had ruled that extortion under the color of official right in circumstances involving campaign contributions occurs only if payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act, Evans modified this standard in non-campaign contribution cases by requiring that the government show only that a public official has obtained a payment to which he was not entitled knowing that the payment was made in return for official acts.

In United States v. Coyne 4 F.3d 100(2d Cir. 1993), Where the Court upheld the following Hobbs act Jury instructions: You may only find the defendant guilty of this crime if you find that he obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts rather than being given voluntarily or unrelated to defendant's office, the defendant need not have affirmatively induced the payment. See also, United States v. Bradley, 173 F.3d 225, 231-32 (3rd Cir 1999) Upholding Hobbs Act jury instructions).

Hobbs act 18 U.S.C. 1951.2 Section 1951(b)(2), defines extortion as the obtaining of property from another, with his consent induced by wrongful use of actual or threatened force, violence or fear or under color of official right. Plaintiff was threatened with arrest for being on the property. The right to possession of the property from the owner in accordance with plaintiff's labor contract with the owner is a form of property. Plaintiff's labor contract with the property owner is also a form of property being extorted by police

Plaintiff's liberty interest, which in itself is a property interests has been threatened by the Henderson Police on multiple occasions. Plaintiff was threatened with incarceration by the Henderson Police if plaintiff returned to the Calico Ridge Neighborhood. Plaintiff was taken to jail for an outstanding warrant after an illegal pretextual stop and search by the Henderson Police Department. Plaintiff was threatened with incarceration by Officer Scoble of the Henderson Police Department when Officer Scoble gave plaintiff a citation for camping and told plaintiff; "the city of Henderson wanted plaintiff off of the property."

These incidents taken together reveal a pattern or practice of extortive measures used against the plaintiff by the Henderson Police Department. This alone is enough to satisfy the extortive element of the Hobbs Act. However, the fact that this pattern or practice of extortive measures was born out of a conspiracy to profit from the incarceration of black people more than completes the extortion inquiry. Plaintiff also contends that the very presence of a police official, with overwhelming force and authority, in an adversarial position thru a discriminatory and illegal purpose is in itself extortive. Therefore, plaintiff contends that all listed incidents with the Los Angeles police, Las Vegas police and Henderson police, where plaintiff was illegally stopped, illegally searched and illegally arrested in a conspiracy to incarcerate black people in return for federal compensation are all acts of extortion and in violation of the Hobbs Act.

"The Big Payback"

James Brown

Plaintiff contends that the named cities of Los Angeles, Las Vegas and Henderson are involved in a racketeering scheme centered upon the illegal incarceration of black people in return for federal compensation. Plaintiff also asserts that the city legislatures, judicial apparatuses, prison complexes and police departments of these named cities work in coordination to achieve maximum federal compensation. In short, these cities are receiving federal compensation for the discriminatory and illegal activities of individuals employed directly under city authority.

Due to a series of cases, after the passage of the Fourteenth Amendment, certain Civil Rights intended for the benefit of former slaves and their descendants was transferred to the corporate structure. In Pembina Consolidated Silver Mining Company v. Pennsylvania 125 U.S. (181) (1888), the court stated; "Under the designation of 'person' there is no doubt that a private corporation is included [in the Fourteenth Amendment]. Such corporations are merely associations of individuals united for a special purpose and permitted to do business under a particular name and have a succession of members without dissolution. Any corporate entity is legally a person.

However, in Will v. Michigan Department of State Police, the Court explained that "A state is not a person under section 1983, but a city is a person under the law." 491 U.S. 58, 1095 S.Ct 2304, 105 L.Ed 2d 45 [1989]. Unless plaintiff is mistaken, states are also incorporated entities and should also maintain person hood status. Nevertheless, plaintiff asserts that the named cities all profited as persons from the illegal and discriminatory racketeering conspiracy to incarcerate black people and people of color in general in return for federal compensation. The listed cities took the payoffs as persons and are in violation of the Hobbs Act.

See United States v. Kincaid-Chauncey, 556 F.3d 923 (9th Cir.2009), where strip club owner caught on wiretap bribing commissioner of Clark County for favorable action on legislation affecting strip clubs was convicted of violating the Hobbs Act. See also United States v. Ganim 510 F.3d 134 (2d Cir 2007) , (Sotomayor J), where defendant was convicted of violating the Hobbs Act for awarding PSG a waste water treatment deal in return for a payoff. See also Evans v. United States, 504 U.S. 255 (1992), where defendant was convicted of violating the Hobbs Act for taking a seven thousand dollar payoff for the rezoning of a tract of land.

"I'll make him an offer he can't refuse."

Robert Dinero (God Father II)

Plaintiff asserts that this conspiracy is systemic to the point that proceeds from illegal federal compensation are infused within the very operations of the cities themselves. The only way to prove individual payoffs is to track the flow of illegal federal compensation down the line to individuals. We are not that naive to believe that cops all around this nation are working so hard to incarcerate black people out of a hate filled drive alone. They are motivated by money also, like their coconspirators in the city legislatures, the city and county prison systems, and employees of the city judicial systems. Every cent of illegal and ill-gotten gains must be accounted for and recollected.

40

Let us come to a mutual understanding. Plaintiff is seeking first and foremost the disgorgement of illegal profits gained from this illegal conspiracy over the past forty years from every township, city, county and state across this nation. I realize that this is a lot of money. I am sure that the court will allow for some type of payment schedule. If for some reason a particular city is unable to pay me my money on time then we shall have to make other arrangements. Just business, nothing personal. I am weary, this meeting is over.

### Violations of Title 18 U.S. Code Section 4, Misprision of a Felony

Title 18 U.S. Code Section 4, Misprision of a Felony: Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years or both.

In United States v. Ciambrone, the court set out the following four elements for the crime of misprision of a felony: (1) the principle must have committed and completed the underlying felony; (2) the defendant must have had full knowledge of such commission; (3) the defendant must have failed to notify the authorities; (4) the defendants must have taken an affirmative step to conceal the crime. 750 F.2d 1416, 1417 (9th Cir. 1984) Also, in Itani v. Ashcroft 298 F.3d 1213, 1216 (11th Cir. 2002), the court explained that "Misprision of a felony requires both knowledge of a crime and some affirmative act of concealment or participation" citing Branzburg v. Hayes, 408 U.S. 665, 696 n 36, 92 S.Ct 2646 (1972).

The evening before Officer Scoble issued plaintiff the camping citation two Henderson Police officers invaded the property claiming that they had received information about a suspicious looking character walking about the property. The officers told the plaintiff that he couldn't be on the property. Plaintiff then gave them the 'all clear' reference number. They called in the reference number and received an 'all clear' from headquarters. The officers insisted that plaintiff was still illegally camping then they left.

The next morning when officer Scoble issued plaintiff the camping citation, plaintiff tried to explain that plaintiff had already given the reference number to the two officers yesterday evening and that they had received an 'all clear'. Officer Scoble replied; "don't you think I've already spoken to them about you, the city of Henderson wants you off the property." Upon the citation officer Scoble lists the fact that plaintiff has been visited by various police officers on multiple occasions.

Plaintiff asserts the fact that officer Scoble stated that he had already spoken to the other officers creates the inference that officer Scoble already knew about the reference number and the 'all clear'. This statement also creates the inference that Officer Scoble informed the two officers about his plans to reinvade the property and to give plaintiff a camping citation. The two officers had prior knowledge of Officer Scoble's discriminatory and illegal plans yet they did nothing to stop him.

The day prior to, the day of and the day after Officer Scoble issued the camping citation to the plaintiff the Ice Cream Factory was closed. The Ice Cream Factory runs seven days a week twenty four hours a day and is never, ever closed. The property is situated in such a way that the only way anyone could see any vehicle parked at the roped off entrance is from the Ice Cream Factory. Plaintiff asserts that if the Henderson Police wanted to conceal their discriminatory and illegal invasion of the property they just happened to pick the perfect time to do so.

41

Plaintiff contends that the two officers and officer Socble worked in concert to violate plaintiff's fundamental rights. All three of the officers invaded the property relying on pretexts to conceal their true intent. They also invaded the property at an opportune time when no one could witness their illegal invasion upon the property. The actions of the three officers where coordinated and completed for a discriminatory purpose.

Plaintiff also asserts that there exists a nationwide discriminatory conspiracy where individuals from different city departments not only fail to notify the proper authorities of these discriminatory and illegal practices but work to aid in their completion and are as a group guilty of the crime of misprision of a felony.

## Malicious Prosecution

In Nevada the elements needed to prevail in a malicious prosecution claim are similar to those at common law.  In Chapman v. City of Reno, the Court outlined the elements of the tort of Malicious Prosecution and are as follows: (1) A lack of probable cause to commence the prior action (2) malice (3) favorable termination of the prior action (4) damages. 455 P.2d 618 (1969).

In Manganeillo v. City of New York, 612 F.3d 149, 160-161(2d Cir. 2010), the court stated; "must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." Also, a lack of probable cause generally creates an inference of malice. Id at 163 (alteration omitted) (quoting Boyd v. City of New York, 336 F.3d 72, 78 (2d Cir. 2003).

The evening prior to officer Scoble's issuance of the camping citation two officers had invaded the property and called in the reference number and received an 'all clear' from headquarters. The next morning when officer Scoble invaded the property to issue the camping citation, plaintiff tried to give him the reference number and explained that the two officers had called it in earlier and got an 'all clear' but officer Scoble replied; "don't you think I have already spoken to them about you?

These circumstances create the inference that officer Scoble was previously aware of the 'all clear' the two officers had earlier received, which creates the inference that officer Scoble was aware that he lacked probable cause to issue the camping citation and commencing legal process against the plaintiff. See Donley et al v. City of Morrow. No. 14 12038 (11th Cir. 2015), arrested for restaurant code violations without probable cause for actual violations.

## Abuse of Process

In Nevada, the elements required to prevail in an abuse of process claim are similar to those existing at common law: (1) an ulterior purpose other than resolving a legal dispute, and (2) a willful act in the use of process not proper in the regular conduct of the proceeding. Kovacs v. Acosta, 787 P.2d 368 (1990). Also, an 'ulterior purpose' includes any 'improper motive' underlying the issuance of legal process. Laxalt v. McClatchy, 622 F. Supp 737, (D. Nev. 1985).

While illegally issuing plaintiff the camping citation officer Scoble stated; "the city of Henderson wants you off of the property." The act coupled with the statement creates the inference that officer Scoble initiated legal proceedings against the plaintiff, for which he lacked probable cause, in order to

42

evict plaintiff from the property. Ultimately, officer Scoble and the city of Henderson intended to use the municipal judicial apparatus for an ulterior, discriminatory and illegal purpose

During the citation issuance encounter officer Socble also stated; "I could arrest you but that would be a bit extreme so I'm going to issue a camping citation instead." The use of threats against plaintiff's fundamental right to liberty and the ulterior purpose of evicting plaintiff from the property clearly suggests the abuse of the legal process against the plaintiff.

<u>Assault</u>

In Fagan v. MPC [1969] 9 QB 439 the court defined assault as any act which intentionally or possibly recklessly causes another person to apprehend immediate and unlawful personal violence. The court also stated that although "assault" is an independent crime and is to be treated as such, for practical purposes today "assault" is generally synonymous with the term "battery" and is a term used to mean the actual intended use of unlawful force to another person without his consent. Id

Plaintiff has provided the court with multiple incidents of the apprehension of unwanted physical contact upon his person by various police officers within various police departments. Plaintiff was illegally made to stand in front of a police vehicle with his hands upon the hood under the threat of arrest in Las Vegas in back of the library and at McCaraan Airport. Plaintiff felt the apprehension of being hand cuffed before he was illegally handcuffed in Las Vegas while being arrested at the child's park and in Henderson while being arrested and transported to the Las Vegas City Jail.

Plaintiff felt the apprehension of an unwanted contact from officer Scoble when he threatened plaintiff with arrest while illegally issuing plaintiff a camping citation. Plaintiff was also assaulted on numerous occasions in Los Angeles when plaintiff felt the apprehension of coming into unwanted physical contact with hot lead when the Los Angeles Police illegally stopped the plaintiff at gun point. See also, DPP v. Little [1992] 1 QB 645. 95 CR App R28.

Plaintiff is aware that the statute of limitations has tolled for most of the described instances from a civil perspective. However, plaintiff requests that the court consider a few tangential facts surrounding the tolled acts of criminal and civil assaults. Plaintiff asserts that the illegal assaults upon his person are an extension of methods used within a nationwide discriminatory conspiracy which plaintiff only recently became aware of. If plaintiff had not relocated to Nevada and seen the identical pattern or practice of discriminatory methods he experienced in Los Angeles he would not have known about the conspiracy or that the multiple assaults against his person where indeed illegal. Therefore, plaintiff asserts that the tolling of the statute of limitations for any of the multiple assaults that plaintiff has endured over the years did not  begin until plaintiff became aware of the nationwide discriminatory conspiracy to profit off of the incarceration of black people and people of color in general.

<u>Battery</u>

In the United States, criminal battery, or simply battery, is the use of force against another, resulting in harmful, offensive or sexual contact. Black's Law Dictionary, Garner p. 162. On multiple occasions plaintiff has been handcuffed, made to place his hands on the hoods of police vehicles and made to sit in the back of police vehicles by Henderson, Las Vegas and Los Angeles police officers. These offensive contacts directed against the person of the plaintiff were all carried out in furtherance of a nationwide

43

illegal discriminatory conspiracy to incarcerate black people and people of color in general in return for government compensation.

Plaintiff contends that he is the victim of multiple batteries upon his person by the listed city police departments. Once again plaintiff requests that the court consider the tolling of the statute of limitations and plaintiff's recent awareness of this nationwide conspiracy. See also Talmage v. Smith, 101 Mich. 370 N.W. 656 (Mich 1894), Doctrine of transferred intent. See also, Garratt v. Daily, 46 Wash 2d 197, 279 P.2d 681, 1956 Washington, mental affirmation of the act.

## Intentional Infliction of Emotional Distress

In Ely v. Whitlock, the court explained the plaintiff must allege that action taken for a specific purpose of infliction of emotional distress or that defendant intended specific conduct and knew or should have known that emotional distress would likely result. 238 Va 670, 385 S.E. 2d 893.

Also, cause of action will lie for emotional distress unaccompanied by physical injury, provided elements are shown (1) wrong doers conduct was intentional or reckless, (2) conduct was outrageous and intolerable in that it offends against generally, accepted standards of decency and morality. (3) There is a causal connection between wrong doers conduct and emotional distress and (4) emotional distress is severe. Also, in Rugg v. McCarty, 173 Colo. 170. 476 P.2d 753 (1970), the conduct must be so extreme in degree as to go beyond the bounds of decency and be such as would be regarded as atrocious and intolerable in a civilized community.

Plaintiff was invaded on three separate occasions by officer Scoble in the early morning hours. Plaintiff was told that he was a liar and illegally threatened with incarceration by officer Scoble. Plaintiff has been illegally searched and arrested on multiple occasions by the Henderson and Las Vegas and Los Angeles police. Plaintiff has been held at gun point on multiple occasions by the Los Angeles police. All of the listed incidents, and more which are not listed, were intentionally done in furtherance of a nationwide discriminatory conspiracy to incarcerate black people for profit. Each incident has caused the plaintiff severe emotional distress resulting in severe headaches and nausea. These listed incidents of outrageous and illegal police behavior have also triggered anxiety attacks whenever plaintiff is followed by a police vehicle which in turn reproduces the severe symptoms. Plaintiff asserts that he suffers from severe emotional distress due to the illegal and intentional predicate acts of the listed police departments.

## False Arrest

False Arrest is the unlawful violation of the personal liberty of another consisting of detention without sufficient legal authority. In order to establish a false arrest claim the person detained must prove that the arrest is unlawful and such unlawful arrest resulted in injury. An arrest is unlawful when the police officers in question did not have probable cause to make the arrest. Landry v. Duncan, 902 So. 2d 1098 (La.App. 5 Cir. Apr. 26, 2005).

In Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007), the court announced; 'a section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York Law. Also, in Holland v. City of Poughkeepsie, to establish such a claim "a plaintiff must show that (1) the defendant intended to confine him or her, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did

44

not consent to confinement, and (4) the confinement was not otherwise privileged." 90 F.3d 841, 844 (2d Dep't 2011) (quoting Lee v. City of New York, 272 A.D. 2d 586, (2d Dep't 2000).

Public officials performing their duties are shielded from liability so long as their conduct does not breach "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). See also Knussman v. Maryland 272 F.3d 625, 633 (4th Cir. 2001), Where the court stated officers are entitled to qualified immunity unless (1) the officers' conduct violates a federal statutory or constitutional right and (2) the right was clearly established at the time of the conduct, such that (3) an objectively reasonable officer would have understood that the conduct violated that right.  See also, Saucier v. Katz, 533 U.S. 201 (2001). See also Trulock v. Freeh, 275 F.3d 391, 399 (4th Cir. 2001).

At McCaaran Airport, under the illegal pretext of plaintiff fitting the description of a suspected luggage thief, plaintiff was made to stand in front of an unmarked police vehicle with his hands placed upon the hood while officers ran his identification for priors and outstanding warrants. In Las Vegas plaintiff was made to stand in front of a police vehicle with his hands upon the hood under the illegal pretext of plaintiff not walking on the sidewalk. At the park in Las Vegas plaintiff was handcuffed and placed into the back of a police vehicle while the officer ran his identification for priors and outstanding warrants.

In Henderson, plaintiff was made to stand in front of a police vehicle with his hands upon the hood under the illegal pretext of plaintiff walking too close to the library when it was closed. In Henderson, plaintiff was stopped and arrested on an outstanding warrant under the illegal pretext of plaintiff walking on the sidewalk adjacent to the Ice Cream Factory. Plaintiff was then transported to the Las Vegas City Jail where plaintiff was incarcerated for two weeks.

In Los Angeles, under the illegal pretext of an unsafe lane change, plaintiff was made to stand facing a wall while his person was searched and his identification ran for priors and outstanding warrants. In Los Angeles, plaintiff was made to sit in his car for over fifteen minutes while officers ran his identification for priors and outstanding warrants under the illegal pretext of plaintiff not coming to a complete stop at a stop sign. In Los Angeles, plaintiff was handcuffed and placed in the back of a police vehicle while the officer ran his identification for priors and outstanding warrants and another arriving officer searched his car under the illegal pretext of plaintiff driving with his lights off while idling in his car in a drive thru lane at a Jack in the Box.

In all the listed incidents the only privilege that the officers could have claimed was the product of the illegal manufacturing of pretexts to justify their illegal and discriminatory methods. See Sorrel v. McGuigan, (4th Cir. 2002), Plaintiff sorrel was erroneously arrested for possessing a legal length folding knife. See also, Rachelle Jackson v. City of Chicago plaintiff falsely arrested because officer lacked probable cause to claim that she tried to steal her gun after accident. See also, Eric Johnson v. City of Chattahoochee Hills, plaintiff falsely arrested for seeking an attorney in connection with two men he had given a ride to. He was held for 99 days in connection with stabbing. In all of the above encounters plaintiff was illegally stopped, searched and detained without probable cause as part of a nationwide discriminatory conspiracy to incarcerate black people and people of color in general.

**False imprisonment**

False imprisonment is the unlawful restraint without consent or legal justification. False imprisonment can be committed by words, acts or both. Dietz v. Finlay Fine Jewelry Corp., 754 N.E.2d 958 (Ind. Ct. App. 2001).

The common law tort of false imprisonment is to be defined as an unlawful restraint of an individuals' personal liberty or freedom of movement. Pechulis v. City of Chicago, 1997 Dist. Lexis 11856 (N.D. Ill. Aug. 7, 1997). False imprisonment involves an unlawful restraint on freedom of movement or personal liberty. Therefore, two essential elements to constitute false imprisonment are:

(1) Detention or restraint against a persons' will
(2) Unlawfulness of the detention or restraint

Plaintiff requests that the court review the police incidents listed under the charge of False Arrest for evidence of false imprisonment. In each instance plaintiff was restrained without probable cause that he either had or was in the process of committing a crime. In every instance illegal pretexts where used in-order to justify the unlawful restraints. These illegal restraints where done in furtherance of a nationwide conspiracy to incarcerate black people and people of color in general for profit. These official discriminatory restraints of the plaintiff, by those clothed with the color of authority, constitute false imprisonment in every instance.

In order to constitute the wrong it is not necessary that the individual be actually confined or assaulted. Whitman v. Atchison, T. & S. F. R. Co., 85 Kan. 150 (Kan. 1911). It is to be noted that, there is no necessity in a false imprisonment case to prove that a person used physical violence or laid hands on another person. It is sufficient to show that at any time or place the person in any manner deprived another person of his/her liberty without sufficient legal authority. Pechulis, Id. The principle element of damages in an action for false imprisonment is the loss of freedom. Sometimes, a court also takes into account the fear and nervousness suffered as a result of the detention. Pitts v. State, 51 Ill. Ct. Cl. 29 (Ill. Ct. Cl. 1999).

See Enright v. Groves 39 Colo.App 39, 560 P.2d 851 (1977), where woman sued police for false imprisonment when she was arrested for refusing to produce her drivers' license when asked. Failure to produce license is not a crime. See also, McCaan v. Walmart Stores Inc. 210 Fed.3d 51 (1st Cir. 2000), Mccaan held in store for being suspected of shoplifting. The court held that physical restraint are not necessary, the threat of force, standing in someone's way or locking the door that serves as the only means of exit can constitute false imprisonment.

**Damages**

Disgorgement is the forced giving up of profits obtained by illegal or unethical acts. In re Gleeson's Will (124 N.E.2d 624 (111 App. 1955), where disgorgement was used as a remedy when the trustee remained as a holdover on the testator's land and acquired a profit.

Plaintiff is seeking the disgorgement of profits from all local, city, county and state illegal methods and racketeering activities. Plaintiff is seeking the disgorgement of profits from the illegal incarceration of black people and people of color in general in return for federal compensation. Plaintiff also seeks disgorgement from medical fraud and per diem fraud from within the prisons. Plaintiff seeks the

46

disgorgement of profit obtained through the highball bail amount price fixing racket engaged upon by the local, city, county and state judiciaries. Plaintiff is seeking the disgorgement of profits from monies obtained through police initiated drug sales. Plaintiff also seeks the disgorgement of profits from the identical discriminatory hospital emergency room racket where hospitals all across this nation charge racially profiled emergency room patients for procedures they never receive leaving the tax payers to foot the bill. In all cases plaintiff is seeking the disgorgement of profits over the last forty years at least.

A jury may award exemplary damages in any civil action in which actual damages are awarded the victim and the injury complained of is accompanied by some malice or reckless disregard of an injured person's rights and feelings. French v. Deane, 19 Colo 504, 36 P.609; Wagner v. Dan Unfug Motors Inc, 35 Colo App 102,529 P.2d 656, Carlson v. Mcneil 114 Colo. 78 162 P.2d 226; Gray v. Linton, 38 Colo. 175, 88 P. 749, Republican Publishing Co. V. Conroy, 5 Colo. App 262,38 P.423. Malice may be inferred from the reckless and wanton acts of the party causing the injury. Cohen v. Fox, 26 Colo, App. 55, 141 P.504. Wanton and disregard of a parties' rights occur if defendant knew or should have known that the injury ultimately complained of would probably result. Clark v. Smalls, 80 Colo. 227, 250 p.385.

Also in Beebe v. Pierce, 185 Colo. 34. 521 P.2d 1263, the court declared; since exemplary damages are punitive and are designed to inhibit or deter the type of conduct for which they are awarded, they are assessed as an addition to the actual damages granted. See also Miller v. Carnation Co, Colo. App (No. 21349, announced February 3, 1977).

Also, pertaining to the issue of predicate acts and the tolling of the statute of limitations. The stature of limitations runs four years prior to the most recent predicate act. Plaintiff would like the court to consider that plaintiff was unaware that the illegal acts by the Los Angeles police against the plaintiff were part of a nationwide criminal conspiracy until he witnessed the pattern or practice of these illegal predicate acts in the cities of Henderson and Las Vegas Nevada. Therefore, plaintiff would like the court to also consider that the statute of limitations  pertaining to predicate acts within this nationwide criminal racket, performed against the plaintiff run four years back from the most recent predicate act which occurred in Los Angeles.

Plaintiff seeks the court's guidance on the issue of remaining damages. However, in all instances and allegations the clear and brooding face of malice is present. Plaintiff alleges a nationwide discriminatory conspiracy where the dark presence of malice is systemic.

*That I will not take from a thread even to a shoelatchet, and that I will not take anything that is thine, lest thou shouldest say, I have made Abraham rich. Genesis 14:23.*

A farmer must reap the first fruits of the harvest and a worker is worthy of his food. Plaintiff must take in some way. Therefore, whatever damages, whether they be from the disgorgement of profits, exemplary damages, treble damages, punitive damages or actual damages plaintiff claims authority over 5% of the total. Plaintiff requests that the Federal Court arrange a charitable fund over which plaintiff shall have authority to make charitable donations. The Federal Court is to have ultimate ownership and control over the fund however, plaintiff is free to select charitable causes to aid subject to the approval of the Federal Court. These illegal profits were harvested from the soil of pain and misery now they shall be used to offer comfort and relief to the poor. The Federal Court is in the best positon to see that this is done.

47

The remaining 95% of whatever damages are awarded to the plaintiff is under the ultimate ownership and control of the Federal Court. Plaintiff requests that the court select a disinterested third party to manage the fund. Of course plaintiff would like to receive timely accounting of the donations and activities of the fund.

Heal the sick, feed the hungry and see that the Gospel is preached to the poor. This is what Jesus commanded his disciples and I do what my Master tells me to do. I only ask two things. That everything we give and do, we give and do in the name of Jesus Christ. Also, it would be appreciated if my uncle Arnold Raymond Cream Jr, was honored in the light of some of your good works. He was a good cop and a servant of Christ till the end. He would have wanted to help. Let your light shine forth for the world to see.

"He has my trophy."

Hakeem Olajuwon (Dream)

We shall share in the true riches of the kingdom of heaven. Through mercy and lovingkindness our path is made straight. If we seek to know God then we shall search for His will in everything. Heaven and earth shall be shaken and only that which is eternal shall remain. Let us create something here that will last long after we are gone. Let us dream of the eternal.

Then He answered and spake unto me, saying. This is the word of the Lord unto Zarubbabel, saying, Not by might, nor by power, but by my spirit, saith the Lord of hosts.   Zechariah 4:6.

God willing.

Sincerely,

*Keith Streater*

Keith R. Streater (Pro Se)

43 W. Pacific Ave Henderson Nevada

Namor90304@yahoo.com

48

EXHIBIT (C)

HENDERSON POLICE DEPARTMENT
CASE INFORMATION

This card is important for you to keep, since it is the only way you will have to refer to your particular case. In addition information should become available to you concerning this case, please contact the Henderson Police Department information desk at 267-4655 from 7:30 a.m. to 5:00 p.m.

The Department relies on a number of factors available in any report to assign a follow-up investigator. Experience has proven that certain information must normally be determined at the time of the initial investigation before a case be solved, except under special circumstances. For example, a suspect caught committing another crime is found with evidence linking him/her to the ora, he/she may confess to the other crimes including this one.

COMPENSATION FOR VICTIMS OF VIOLENT CRIMES: Victims of crimes may qualify for monetary compensation from the State of Nevada under NRS 217.280. For information or an application, call Clark County Victim's Allowance Office Victim Services Center at (702) 671-2335. Note: applications for this service must be received within one year of the commission of the crime.

ASSISTANCE TO VICTIMS OF SEXUAL ASSAULT: Victims of sexual assault may be eligible for medical treatment and counseling under NRS 217.290. For information call the Clark County District Attorney's Office Victim Services Center at (702) 671-2525, or the Community Action Against Rape at (702) 366-1640. Note: Applications for this service must be received within 60 days of commission of the crime.

PROTECTION FOR VICTIMS AND WITNESSES: (Felony/Gross Misdemeanor) When a case is prosecuted, each victim/witness will receive an initial notification by mail from the Victim Assistance Center. In addition, victims/witnesses in cases in which the case is not prosecuted are also eligible to certain rights as indicated in NRS 178.569 (i.e. investigator of threats of harm, notice of release of defendant, a listing of property being held by a law enforcement agency). For further information concerning these rights, you may contact the investigator handling your case or the Victim Assistance Center.

Share your thoughts about the Henderson Police Department by taking a 5 minute survey at :

http://www.cityofhenderson.com/police/survey.php

---

State of Nevada
City of Henderson

TRAFFIC MISDEMEANOR CITATION/COMPLAINT

Citation #: HPD0049000020

In the Justice/Municipal Crt:
HENDERSON JUSTIS/MUN COURT            COURT

Def Type:
☐ Driver
☐ Passenger
☐ Pedestrian
☐ Other:

DR #
15-08467

☐ Juvenile
☑ Traffic
☐ Criminal
☐ Parking
☐ Accident
☐ Warning

☐ Evidence
Logged
☑ Arrest

☐ School Zone
☐ Construction Zone
☐ Hazmat
☐ S.T.E.P.

Travel Direction: ☐ N      ☐ S      ☐ E      ☐ W
At Location: 1461 EAST LAKE MEAD PKWY

Violation Date: 05/24/2015        Issue Date: 05/24/2015
Violation Time: 0530              Issue Time: 0530

Name (Last, First, Middle):
STREATER ,KEITH,R                 SSN: 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

Address:
LAKE MEAD PARKWAY                 Country: UNITED STA

City:
HENDERSON          State: NV      Zip Code: 89015

DOB: 05/19/1965    Race: B    Sex: M    Ht: 602    Wt: 180    Hair: BRO    Eye: BR

DL/OLN/ID:         ☐ CDL   State: NV   Class.   Expiration:   Restrict.   Endr.

Commercial Vehicle ☐   US DOT #:         VIN #:

Vehicle License:

Year:    Make:    License State: NV    Expires: /

         Model:                        Type:      Color:

Registered Owner:
Address:

1 Violation #: 8.37.010    NOC: 55599    ☐ NRS   ☑ H.M.C.   ☐ CFR

Description: CAMP OUTDOORS W/O PERMISSION

Posted Speed:    Actual Speed    Cited Speed    Bail Amt: 640    No Bail

To Wit: DID WILFULLY CAMP OR PROPERTY AFTER BEING ADVISED MULTIPLE TIMES NOT TO KEITH ADVISED TI AT THE OWNER OF PROPERTY HIRED HIM TO WATCH IT.

---

EXHIBIT (B)

NEW JERSEY AUTO DRIVER LICENSE

DC S4349 42579 06652
dob 05-19-1965
iss 03-23-2012
STREATER
KEITH R
2759 PARK AVE
IRVINGTON, NJ 07111
eos NONE
sex M
exp 03-31-2016

EXHIBIT (A)

**Utility Mailer**
**10 1/2" x 16"**

**FROM:**

Keith Straube
43 W Pacific Blvd
Henderson NV 8908

**TO:**

United States District Court
District of Nevada
333 S Las Vegas Blvd
Las Vegas NV 89101

7015 0640 0000 5601 6391

CERTIFIED MAIL

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

U.S. POSTAGE
PAID
HENDERSON, NV
89015
JUL 18, 15
AMOUNT
$9.40
0012847-06

UNITED STATES
POSTAL SERVICE®

1000

89101

**ReadyPost**